Argued and submitted June 11, 1998, affirmed March 17, 1999

Joh WASHA, Jr.,
Personal Representative of the Estate of
Holly Carol Washa,
*Respondent,*

*v.*

OREGON DEPARTMENT OF CORRECTIONS,
*Appellant,*

*and*

Donald S. CRANE, M.D.,
*Defendant.*

OREGON DEPARTMENT OF CORRECTIONS,
*Third-Party Plaintiff,*

*v.*

Cal C. BROWN,
*Third-Party Defendant.*

(94C-10004, CA A93626 (Control))

Susan SCHNELL,
*Respondent,*

*v.*

OREGON DEPARTMENT OF CORRECTIONS,
*Appellant.*

(94C-10005, CA A93627)
(Cases Consolidated)

979 P2d 273

Jas. Adams, Assistant Attorney General, argued the cause for appellant. With him on the briefs were Hardy Myers, Attorney General, and Virginia L. Linder, Solicitor General.

Jess M. Glaeser argued the cause and filed the brief for respondents.

Before De Muniz, Presiding Judge, and Deits, Chief Judge, and Haselton, Judge.

HASELTON, J.

De Muniz, P. J., concurring.

## HASELTON, J.

Defendant, Oregon Department of Corrections (DOC), appeals from a judgment for damages resulting from violent crimes that a parolee committed while under DOC's supervision. We agree with defendant that it had not "taken charge" of the parolee within the meaning of section 319 of the *Restatement (Second) of Torts* (1965). However, we also conclude that the harm plaintiffs suffered was a reasonably foreseeable consequence of defendant's inadequate supervision of the parolee, and that, in the circumstances presented here, the parolee's actions were not the sort of supervening criminal conduct that would otherwise preclude liability. Accordingly, we affirm.

The record, viewed in the light most favorable to plaintiffs, as the prevailing parties,[1] disclosed the following material facts: In 1984, Cal Brown was sentenced as a dangerous offender under ORS 161.725 for his attempted assault on a woman in Corvallis. At that time, Brown already had an extensive criminal record, including a 1977 conviction in California that involved a knife assault on a woman in a shopping center. Brown served the minimum seven-and-a-half-year sentence for the Oregon attempted assault conviction and was released on parole from the Oregon State Penitentiary on March 25, 1991, after receiving a favorable psychiatric evaluation.

Upon Brown's release, DOC placed him under the supervision of Parole Officer Larry Wibbenmeyer, a DOC employee. Wibbenmeyer, who specialized in the supervision of sex offenders, was assigned to Brown because Brown's prior criminal conduct involved "potentially sexually predatory behavior." Wibbenmeyer was given a copy of a letter to the Parole Board from District Attorney Peter Sandrock, the prosecuting attorney on the 1984 conviction. In that letter, Sandrock stated that not only did he consider Brown to be one of the most dangerous criminals whom he had ever prosecuted, but also that "unless [Brown] has undergone a

---

[1] *Brown v. J. C. Penney Co.*, 297 Or 695, 688 P2d 811 (1984).

remarkable transformation in prison, he will remain a potential mutilator and killer of women." Other sources of information available to Wibbenmeyer included a 1984 psychological report and presentence investigation report documenting Brown's history of sexually predatory and physically assaultive conduct towards women and his sexual fantasies regarding female bondage and violence towards women. Wibbenmeyer was aware that Brown historically had not responded well to community supervision, had avoided the responsibilities surrounding probation and legal proceedings, and had absconded from the jurisdiction of various courts.[2]

DOC classified Brown as requiring the highest level of supervision. Wibbenmeyer was required to make a minimum of one unscheduled successful home visit each month, in addition to meeting with Brown at least twice a month for scheduled office visits. Brown was required to comply with all conditions of his parole, which, according to Wibbenmeyer's testimony, included a requirement that Brown notify Wibbenmeyer if he would be away from his residence for more than 24 hours.

Brown rented an apartment in Eugene and enrolled in classes at the University of Oregon.[3] During the month of April, Wibbenmeyer had five contacts with Brown, including an unscheduled home visit on April 30, 1991.[4] Wibbenmeyer next saw Brown for a scheduled office visit on May 10, 1991, at which time they scheduled the next office visit for May 24, 1991. Up to that point, to the best of Wibbenmeyer's knowledge, Brown had complied with every condition and requirement of his parole.

---

[2] Regarding a meeting with Brown on March 26, 1991, Wibbenmeyer testified, "I heard from Mr. Brown the right sorts of language but * * * I wasn't sure that I had confidence that he had internalized [the materials from his treatment programs] to any degree."

[3] Because Brown's 1984 attempted assault took place in Corvallis, where he was enrolled as a student at Oregon State University, Brown's parole order provided that he was "not to enter or reside in Linn or Benton counties," nor to have "contact with the victim * * * or her family."

[4] On that visit, Wibbenmeyer observed that Brown took a very long time to answer the door, and that Brown seemed anxious to remove several R rated videos from the video machine. Wibbenmeyer inquired as to whether Brown used the videos for masturbation, and directed him to discuss the videos during his mental health treatment sessions.

On both May 14 and May 16, 1991, Wibbenmeyer attempted to make unscheduled home visits but did not find Brown at home on either occasion. On May 16, Wibbenmeyer noticed a pizza coupon taped to Brown's door. When he returned the next morning, Friday, May 17, he observed that the coupon was still there. Wibbenmeyer testified that he then left his business card on Brown's door and that, although his concern that Brown had absconded "increased" at that point, he did not feel that he had proof certain.

On Monday, May 20, 1991, Wibbenmeyer received a phone call from a Eugene resident relating that he had sold a car to Brown and that Brown's check had been returned for insufficient funds. Wibbenmeyer immediately contacted the Eugene Police Department to check for active cases involving Brown but learned that there were none. Later that same morning, Wibbenmeyer went to Brown's home and found that the card he had left on Friday was still there. Wibbenmeyer then attended Brown's 11:30 a.m. class at the University of Oregon, but Brown did not show up. Wibbenmeyer testified that at that point he was "motivated" to request a warrant for Brown from the Board of Parole and Post-Prison Supervision, but that his supervisor felt that there was not sufficient evidence that Brown had absconded.[5] On Monday afternoon, Wibbenmeyer returned to Brown's apartment and left a note asking Brown to call him immediately. On either Tuesday, May 21, or Wednesday, May 22, Wibbenmeyer left a message on Brown's answering machine warning him that if he did not contact Wibbenmeyer within 24 hours, a warrant would be issued. Brown did not contact Wibbenmeyer.

On May 23, 1991, with his supervisor's permission, Wibbenmeyer asked the Board to issue a warrant for Brown's arrest. The Board approved Wibbenmeyer's request and issued an Oregon-only warrant.[6] The warrant authorized any police officer to arrest and detain Brown without opportunity for bail.

---

[5] It was office policy that a parole officer could not request a warrant without the approval of a supervisor.

[6] Under the Board's policy, the fact that Brown had been convicted of attempted assault, not assault, dictated issuance of an Oregon-only warrant, rather than a nationwide warrant, for his immediate arrest.

On the same morning that the Board issued a warrant for his arrest, Brown kidnapped Holly Washa near Seattle, Washington, by forcing his way into her car and holding her at knife point. Brown then took her to a hotel room near the Sea-Tac airport, where, over the course of 36 hours, he held her hostage, raped her, sodomized her, tortured her, and stabbed her in the neck and body. He tied her up and left her to die in the trunk of a rental car in a parking lot near the airport.

Brown then boarded a plane and flew to Ontario, California, where he met plaintiff Susan Schnell. Brown had met Schnell a week earlier on a flight from Los Angeles to Seattle, and they had made arrangements to spend Memorial Day weekend together in nearby Palm Springs. On the night of May 26, 1991, in a hotel room in Palm Springs, Brown attacked Schnell by slashing her throat in three places, cutting her finger, tying her up, raping her and torturing her. In the early morning hours of May 27, 1991, when Brown left the hotel temporarily, Schnell was able to contact the front desk. The police arrived and arrested Brown upon his return to the hotel.

Brown pleaded guilty to charges in California and was then extradited to King County, Washington, where he was convicted of Washa's murder and sentenced to death. Brown is currently awaiting execution in Washington, pending appeal.

On April 5, 1993, plaintiff John Washa, Jr., the personal representative of Holly Washa's estate, and plaintiff Susan Schnell filed these actions against DOC and Dr. Donald Crane. In their complaints, plaintiffs alleged that (1) DOC and Crane were negligent in conducting the dangerous offender evaluation that was before the Board at the time it rendered its parole decision;[7] and (2) DOC was negligent in its supervision of Brown while he was on parole. The actions were subsequently consolidated for trial. Pursuant to a stipulation of the parties, the trial court directed that the case

---

[7] Crane was subsequently dismissed from the case. At trial, DOC prevailed on the first claim, pertaining to preparation of the dangerous offender evaluation, and that claim is not at issue on appeal.

would be tried before the Honorable Kurt Rossman as a reference judge.[8]

At trial, plaintiffs argued, *inter alia*, that defendant was negligent in its supervision of Brown in three particulars: (1) failing to make frequent home visits to Brown's residence; (2) failing to closely and carefully monitor Brown's whereabouts; and (3) failing to take adequate steps to ascertain Brown's whereabouts when it knew or should have known that Brown had absconded from parole.[9] Tracking the analysis in *Fazzolari v. Portland School Dist. No. 1J*, 303 Or 1, 17, 734 P2d 1326 (1987), plaintiffs argued that defendant's liability arose either from defendant's special role as Brown's parole supervisor or, in the alternative, under principles of general foreseeability.[10] Specifically, plaintiffs argued that, because of defendant's role as Brown's parole supervisor, defendant had a special duty under section 319 of the *Restatement (Second) of Torts* to prevent Brown from causing their injuries. Alternatively, plaintiffs argued that, even if the relationship between defendant and Brown did not create a special duty, defendant's supervision of Brown was negligent under principles of *Fazzolari* general foreseeability because it unreasonably created a foreseeable risk of the very kind of harm that befell plaintiffs.

The reference judge concluded that defendant was liable under both theories. In particular, the reference judge unequivocally stated, "I find and conclude that the parole

---

[8] The findings of a reference judge have the same effect as a jury verdict. ORCP 65 E(3); *Ins. Co. of N. America v. Schwabe, Williamson & Wyatt*, 109 Or App 182, 818 P2d 968 (1991), *rev den* 312 Or 588 (1992). On appeal, DOC does not dispute the reference judge's factual findings in this case. We review the reference judge's legal conclusions for errors of law. *Ins. Co. of N. America*, 109 Or App at 185.

[9] The reference judge based his verdict for plaintiffs solely on those three allegations of negligent supervision. He concluded that plaintiffs failed to prove their additional, alternative allegations of failure to monitor Brown's lithium medication and failure to notify other jurisdictions of Brown's escape status.

[10] In *Fazzolari*, the Supreme Court stated:

"[U]nless the parties invoke a status, a relationship, or a particular standard of conduct that creates, defines, or limits the defendant's duty, the issue of liability for harm actually resulting from defendant's conduct properly depends on whether that conduct unreasonably created a foreseeable risk to a protected interest of the kind of harm that befell the plaintiff." 303 Or at 17.

officer did 'take charge' of Brown, within the meaning of section 319 of the *Restatement (Second) of Torts* (1965), as adopted by the *Buchler [v. Oregon Corrections Div.,* 316 Or 499, 853 P2d 798 (1993)] court." Moreover, while his holding with respect to plaintiffs' general foreseeability claim is not so explicitly stated, the record as a whole indicates that the reference judge concluded that defendant's negligent supervision of Brown created a reasonably foreseeable risk that women, such as plaintiffs, would be assaulted by Brown.[11] The reference judge concluded that plaintiff Washa was entitled to recover $100,000 in economic damages and $100,000 in noneconomic damages, and that plaintiff Schnell was entitled to recover $40,627 in economic damages and $100,000 in noneconomic damages.[12]

On appeal, defendant advances two broad challenges. First, because defendant's relationship to Brown involved supervision—and not physical custody—defendant did not have a duty under section 319 of the *Restatement (Second) of Torts* to prevent Brown from causing harm to plaintiffs. Second, defendant asserts, the trial court erred in holding it liable under general foreseeability principles, because Brown's intervening intentional criminal actions precluded such liability.[13] *See Buchler,* 316 Or at 511-14. We agree with defendant on the first issue, but not on the second.

Defendant asserts that plaintiffs' argument under section 319 of the *Restatement (Second) of Torts* is controlled by *Buchler, McAlpine v. Multnomah County,* 131 Or App 136, 883 P2d 869 (1994), and *Kim v. Multnomah County,* 138 Or

---

[11] Defendant's opening brief on appeal and plaintiffs' responding brief both assume—and are premised on the understanding that—the reference judge did, in fact, resolve both the section 319 ground and the "general foreseeability" ground in plaintiffs' favor. Our review of the findings and conclusions confirms that reading.

[12] The reference judge noted that the application of the Oregon Tort Claims Act "cap" on damages, ORS 30.270, worked a "great injustice in this case," and that, but for this "cap," he would have awarded plaintiff Washa $301,493.23 in economic damages and $3.5 million in noneconomic damages, and plaintiff Schnell $40,627.26 in economic damages and $5 million in noneconomic damages.

[13] Defendant does not dispute on appeal that its supervision of Brown was inadequate in the three respects found by the reference judge. Nor does defendant dispute plaintiffs' proof of causation-in-fact—*i.e.,* that if defendant had adequately supervised Brown, he would never have committed his crimes in Washington and California.

App 417, 909 P2d 886, *aff'd* 328 Or 140, 970 P2d 631 (1998), and cannot succeed because defendant did not have the actual ability to control Brown's conduct. Plaintiff responds that DOC should be liable for plaintiffs' injuries because it had significant control over Brown and knew that Brown was likely to cause bodily harm if he were to abscond from parole. Whether defendant had a special duty under section 319 hinges on the language of section 319 and our cases interpreting it.

■     Section 319 of the *Restatement (Second) of Torts* provides:

> "One who *takes charge* of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm." (Emphasis added.)

In *Buchler*, the Supreme Court adopted section 319 as Oregon's common-law rule governing "a custodian's duty concerning a prisoner in Oregon." 316 Or at 506. There, a convicted felon escaped from a work camp by driving away in the state's van in which the ignition keys had been left by the crew supervisor. Fifty miles away, the escaped prisoner stole a gun from his mother's home and shot two people in the nearby woods. His victims sued DOC's predecessor, the Oregon Corrections Division, for negligence, arguing, *inter alia*, that the Division had breached its section 319 duty by failing to prevent the prisoner from escaping and causing harm to plaintiffs.[14] The court's analysis of liability under section 319 consisted of two discrete inquiries:

> "Applying the rule, as it is stated in section 319, to the present case, there is no dispute that defendant *took 'charge of' the prisoner*. Therefore, the controlling question in this case is whether defendant *knew or should have known that the prisoner was 'likely to cause bodily harm to others if not controlled.'* " *Buchler*, 316 Or at 506-07 (emphasis added).

---

[14] The plaintiffs in *Buchler* also asserted that defendant was liable under principles of general foreseeability for (1) leaving the keys in the ignition of the van the criminal used to escape, and (2) failing to warn the plaintiffs of the prisoner's escape. The court treated the section 319 claim and the two "general foreseeability" negligence claims as three separate and analytically distinct issues.

The court then concluded that, because the prisoner's criminal record consisted only of nonviolent property crimes, no reasonable person could conclude that the Division knew or should have known that he was likely to cause bodily harm to others. *Id.* at 507. Accordingly, the Division had not violated a special duty arising under section 319.

After *Buchler*, we considered negligence liability arising under section 319 in two cases, *McAlpine* and *Kim*. In *McAlpine*, the plaintiff was assaulted by a parolee for whom the Oregon Board of Parole had issued an arrest and detain warrant two months earlier. The plaintiff sued Multnomah County for negligent supervision under section 319. Specifically, the plaintiff alleged that, because the county narcotics agents had been investigating the parolee's drug involvement, they should have known about the outstanding warrant, and, consequently, their failure to make an arrest under the warrant was negligent. Relying on the language of section 319 and *Buchler*, we concluded that the plaintiff did not state a negligence claim under section 319 because, although the county, through its agents, had the authority to arrest the parolee, it had never "taken charge" of him:

> "[P]laintiff's complaint alleges only that defendants knew or should have known of the arrest warrant for Charlesworth, that they knew or should have known of Charlesworth's violent history, and that they had Charlesworth under surveillance. Plaintiff did not allege that defendants had taken charge of Charlesworth. Nothing in the pleadings permits the inference that defendants had taken charge of or had control over Charlesworth, *or had Charlesworth in custody.*" *McAlpine*, 131 Or App at 142 (emphasis added).

We next addressed negligence liability under section 319 in *Kim*, 138 Or App 417, which the Supreme Court has since affirmed. 328 Or 140, 970 P2d 631 (1998). There, the issue was whether the defendant, Multnomah County, had "taken charge" of a probationer within the meaning of section 319. The plaintiffs were robbed and assaulted by Lawrence, who was on probation after a conviction for assault in the fourth degree. The plaintiffs sued the county for negligence, alleging, *inter alia*, that the county was liable under section 319 because the county probation officer assigned to

Lawrence (1) had negligently failed to inform the court of certain facts during a probation revocation hearing and (2) had failed to issue a detainer warrant. The trial court granted summary judgment to the county and dismissed the action.

On appeal to this court, plantiffs again argued, *inter alia*, that the county, through its probation officer, had "taken charge" of Lawrence within the meaning of section 319.[15] Relying in part on the holding in *Buchler,* we concluded that the county was not liable for breach of a special duty under section 319:

> "The policy underlying section 319 is that, because custodians or those who have the ability to control third persons are able to foresee the risk created by the person under their control, they are required to take precautions accordingly. *We think it is more in keeping with the policy underlying the rule to require that the third person be in the defendant's custody or under its control at the time of the negligent act before liability under section 319 attaches.*" *Kim,* 138 Or App at 423-24 (emphasis added).

In reaching that conclusion, we made it clear that we were aware that other jurisdictions construe section 319 "taking charge" to apply to public officials who negligently *supervise* a third person, but who do not have custody or control over that third person.[16] We declined to follow those jurisdictions, concluding instead that section 319 applies *only* when the third person is "in the custody" or "under the control" of the defendant and that supervisory duties without more do not constitute custody or control.

---

[15] The plaintiffs did not argue that even if the County was not liable under section 319, it was liable under principles of general foreseeability. *See Kim,* 138 Or App at 423 n 2. On review, the Supreme Court stated that it would have reached plantiffs' general foreseeability argument but for the lack of preservation, because

"[s]ection 319 is an example of a theory of liability based on a 'special relationship.' By contrast, the general foreseeability theory of liability, outlined in *Fazzolari,* speaks to circumstances in which a special relationship is not present. *See, e.g., Buchler,* 316 Or at 504 (explaining distinction)." *Kim,* 328 Or at 146 n 2.

[16] *See, e.g., Taggart v. State,* 118 Wash 2d 195, 822 P2d 243 (1992) (holding that parole officers had "taken charge" of the parolees they supervised, and that a physical custodial relationship was not required for liability to attach under section 319); *see also Sterling v. Bloom,* 111 Idaho 211, 723 P2d 755, 769 (1986).

On review, the Supreme Court affirmed our decision in *Kim*, reasoning that:

> "Implicit in the proposition in section 319 that one has a 'duty to exercise reasonable care to *control*' a third person he has 'taken charge of' 'to prevent him from doing * * * harm' is the notion that one has the legal ability to take charge of that person." 328 Or at 147.

The court concluded that, in the probation officer-probationer relationship, the probation officer does not have the ability to prevent a probationer from harming others. Specifically, the court noted that a probationer is entirely free to do what he pleases, when and where he pleases, so long as his actions are within the limits set by the conditions of his probation. Indeed, the court observed, probation officers do not, and should not be expected to, follow a probationer around preventing him from harming members of the public.[17] "[A] probation officer does not * * * exercise a degree of supervision that permits the conclusion that the relationship between the parties is a form of custody." *Id*.

■    We acknowledge that there are certain distinctions between the probation addressed in *Kim* and parole in this case, but, nonetheless, we conclude that *Kim* is dispositive here. We so conclude because we determine that three characteristics common to both the county probation officer's relationship to the probationer in *Kim,* and DOC's relationship to Brown, outweigh the distinctions raised by plaintiffs.

First, both the probationer in *Kim* and Brown in this case were under the *supervision* of the defendant entities.

---

[17] Plaintiffs argued that a probation officer's authority to search a probationer's person or home without a warrant, to impose sanctions on a probationer, and to issue warrants for a probationer's arrest for violation of conditions of probation establishes "taking charge" for section 319 purposes. The Supreme Court rejected that argument:

> "Although the existence of those powers demonstrates that probation officers have the ability to compel a probationer's compliance with the conditions of his probation, they do not permit the inference that a probation officer can control a probationer's conduct in such a way as to prevent him from harming others. *By contrast, in a custodial relationship, a custodian is responsible for controlling the person's activities and is required to, and actually has the legal ability to, take precautions to prevent the person from doing harm." Kim*, 328 Or at 147-48 n 3 (emphasis added).

That supervision was, necessarily, limited to periodic contacts. Thus, DOC, like Multnomah County in *Kim*, did not have the *continuing* ability to direct Brown's actions and conduct on an hourly, daily, or even weekly basis.[18]

Second, here, as in *Kim*, the terms of the supervisory relationship were dictated largely, albeit not exclusively, by another entity. In *Kim,* the ultimate authority to set the terms of Lawrence's probation, beyond those required by statute, lay with the court. *See* ORS 137.540(2) (authorizing the court to modify statutory probation conditions or impose special conditions reasonably related to the crime of conviction, public safety, or reformation of the offender). In the parole context, the Board of Parole and Post-Prison Supervision, not DOC, has the authority to dictate the general contours of DOC's supervision of each parolee. *See* ORS 144.270(3) (authorizing the Board to supplement the statutory parole conditions with special conditions for particular individuals). Although DOC and the individual parole officer have some discretion as to the intensity of supervision in individual cases, the general terms are imposed by the Board.

Third, neither DOC in this case, nor the county in *Kim,* had the authority to revoke the probation or parole in question. *See Kim*, 328 Or at 149 ("[i]t was not within [the probation officer's] power to revoke Lawrence's probation and, therefore, she did not have the ability to control his conduct by preventing his release"); *see also* ORS 137.550(4). The same is true in the parole context: The Board of Parole and Post-Prison Supervision is the only entity with the authority to revoke parole. ORS 144.343(2).

---

[18] Several jurisdictions have concluded that section 319 "taking charge" exists only where the defendant has actual physical custody or control of the third person. *See, e.g., Fox v. Custis*, 236 Va 69, 75, 372 SE2d 373 (1988) (holding that parole officers did not "take charge" of the parolee because the statute empowering officers to supervise parolees "does not contemplate continuing hourly or daily dominance and dominion by a parole officer over the activities of a parolee"); *Lamb v. Hopkins*, 303 Md 236, 492 A2d 1297 (1985) (holding that probation officers do not "take charge" of probationers so as to give rise to a duty to exercise due care in controlling the probationers because of the lack of a custodial relationship and the relative freedom the probationers have in conducting their day-to-day affairs).

Given those factors, we conclude that this case is not materially distinguishable from *Kim*. Accordingly, we conclude that defendant did not "take charge" of Brown within the meaning of section 319, and that defendant's relationship to Brown did not create a special duty under section 319.

Our conclusion that defendant did not have a duty under section 319 to prevent Brown from harming plaintiffs does not end our inquiry. We must next consider plaintiffs' claim that defendant' conduct was negligent under principles of *Fazzolari* general foreseeability.[19]

■ Plaintiffs argue that harm to individual members of the public, of the sort that befell plaintiffs, was a reasonably foreseeable consequence of defendant's failure to make frequent home visits to Brown's residence, failure to closely monitor Brown's whereabouts, and failure to ascertain his whereabouts when it knew or should have known that he had absconded from parole. Defendant, relying on *Buchler* and *McAlpine*, argues that Brown's intervening intentional criminal conduct—not defendant's conduct—created the risk and caused the harm to plaintiffs, and thus, as a matter of law, defendant cannot be liable under general foreseeability principles.[20]

---

[19] We use the term "general foreseeability" in this context to refer to liability that arises not from a specific duty established by statute, status, or relationship, but because the harm to plaintiffs was a foreseeable result of defendant's unreasonable conduct. *See Fuhrer v. Gearhart By The Sea, Inc.*, 306 Or 434, 437, 760 P2d 874 (1988) ("in the absence of a duty arising from [statute, status, or relationship], a defendant may be liable for conduct which is unreasonable in the circumstances if that conduct results in harm to a plaintiff and the risk of harm to the plaintiff or the class of persons to whom the plaintiff belongs was foreseeable") (restating the holding of the *Fazzolari* trilogy).

[20] At oral argument, defendant also argued for the first time that *Buchler* adopted the general rule in section 315 of the *Restatement (Second) of Torts* that "[t]here is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another * * *." Defendant argued that, even under principles of general foreseeability, section 315 precludes defendant's liability for Brown's acts. *Compare Buchler*, 316 Or at 505 ("*It appears that liability under section 319 is an exception to a general rule of non-liability for the conduct of others.*") (emphasis in original) *with Faverty v. McDonald's Restaurants*, 133 Or App 514, 523, 892 P2d 703 (1995), *rev dismissed* 326 Or 530 (1998) ("defendant is not entitled to limit its duty to plaintiff by invoking section 315 * * * [because u]nder *Fazzolari*, * * * [defendant] is subject to the general duty to avoid conduct that unreasonably creates a foreseeable risk of harm to a plaintiff").

That argument represents a dramatic departure from the analysis that defendant urged to the trial court and, for that matter, in its briefs on appeal, and we do

Defendant is correct that our consideration of this issue is informed by *Buchler* and *McAlpine*. In *Buchler*, after disposing of the section 319 claim, the court considered the plaintiff's general negligence claim that, by leaving the keys in the van, the defendant had facilitated the escaping inmate's subsequent criminal/tortious conduct:

> "While it is generally foreseeable that criminals may commit crimes and that prisoners may escape and engage in criminal activity while at large, that level of foreseeability does not make the criminal's acts the legal responsibility of everyone who may have contributed in some way to the criminal opportunity.
>
> "* * * * *
>
> "[T]he current state of tort law does not reach so far as plaintiffs would have it reach in this case. As a matter of law, the harm that actually occurred did not result from any risk of harm to others that was unreasonably created by leaving keys in the van." 316 Or at 511-14.

In general terms, that holding in *Buchler* had the effect of limiting the scope of foreseeable harms for which a defendant is liable to *reasonably* foreseeable harms.[21] In applying that modified *Fazzolari* standard to the facts before it, the court determined that an "intervening criminal instrumentality caused the harm and created the risk" and, therefore, the harm was not *reasonably* foreseeable to the defendant. In other words, because the parolee's criminal conduct—not the defendant's leaving of keys in the van—created the risk of harm, the defendant was not liable. *Id.* at 514.

Here, defendant invokes *Buchler* for the proposition that the intervening criminal conduct of a third person always cuts off a defendant's liability under *Fazzolari* principles because the risk of harm is created by the third person's criminal conduct, not the defendant's conduct. Reduced to its essentials, defendant's argument is that, under *Buchler*, harm caused by the criminal conduct of a third party can

not address it. *See State v. Stanley*, 153 Or App 16, 21, 955 P2d 764 (1998) (declining to consider argument not raised until oral argument).

[21] *See generally* Caroline A. Forell, *The Good News and Bad News About Buchler v. Oregon Corrections Division*, 72 Or L Rev 919, 920 (1993).

*never* be reasonably foreseeable to a defendant. As explained below, we disagree.

*Buchler* itself does not present a clear indication of whether, or to what extent, the nature of a prisoner's criminal history properly bears on the general foreseeability analysis in a negligent supervision claim. In concluding, for purposes of the section 319 analysis, that the defendant did not know or have reason to know that the prisoner was "likely to cause bodily harm to others if not controlled," the *Buchler* court was persuaded by the fact that the prisoner's criminal record involved only nonviolent property crimes.[22] However, in analyzing whether the harm to the plaintiffs was a reasonably foreseeable consequence of the defendant's leaving keys in the van, the court did not refer to the prisoner's nonviolent history. While *Buchler* itself does not appear to resolve that question, our post-*Buchler* decisions in *McAlpine* and *Allstate Ins. Co. v. Tenant Screening Services, Inc.*, 140 Or App 41, 914 P2d 16 (1996), do.

In *McAlpine*, we considered whether it was reasonably foreseeable that a convict on parole following a drug conviction would cause injury to members of the public if the county failed to exercise its power to arrest him. Relying on *Buchler*, we concluded that, because neither the warrant nor the original conviction suggested that the parolee was prone to violent behavior, the injuries sustained by the plaintiff were not risks unreasonably created by the defendant's failure to arrest him. We noted that while criminal conduct is always foreseeable on some level, it was not *reasonably* foreseeable to the county that a historically nonviolent parolee would assault the plaintiff. *McAlpine*, 131 Or App at 143. Therefore, the parolee's *unexpected* violent criminal act was not a reasonably foreseeable consequence of the defendant's failure to arrest the parolee. *Id.*

---

[22] In that context, the *Buchler* court stated:

"As noted previously, the prisoner's criminal record only concerned property crimes, not acts of violence. * * * We do not think that a childhood temper problem or even long drug use, without more, permits a reasonable juror to infer that this prisoner was 'likely to cause bodily harm to others.' It is not possible for a reasonable person to find from this record that a custodian would have known that this particular prisoner was 'likely to cause bodily harm' of the kind that befell plaintiffs two days after his escape." 316 Or at 507.

More recently, we employed similar reasoning in *Tenant Screening Services*. There, the owner of an apartment complex hired Tenant Screening Services to run background checks on potential tenants. In reliance on the service's report that a potential tenant, Taylor, had a clean criminal record, the owner leased an apartment to Taylor. Taylor, who, in fact, had a criminal record of petty theft and aggressive behavior, sodomized and sexually abused a female tenant. Taylor's victim sued the building owner, who in turn settled with her. The owner's insurer then filed an action against Tenant Screening Services to recover the monies paid in settlement, alleging that Taylor's attack on the female tenant was a reasonably foreseeable consequence of the defendant's alleged negligent misrepresentations. In concluding that the attack was not a reasonably foreseeable consequence of the alleged misrepresentations, we emphasized, *inter alia*, that nothing in Taylor's criminal record foreshadowed that he was likely to commit violent sexual crimes:

> "Consistent with *Buchler*, we conclude that plaintiff failed to allege facts showing that Taylor's sexual attack on K was a reasonably foreseeable consequence of defendant's alleged negligent misrepresentation that Taylor had a clear criminal record. * * * First, although it may be generally foreseeable that criminals will commit crimes, nothing in Taylor's record * * * foreshadowed his particular crimes against K. Plaintiff did not plead facts showing that Taylor had been convicted of any sexual offenses. The fact that he had been convicted of petty theft and 'fight/noise/offensive words' could suggest aggressive conduct but does not suggest an inclination to commit the serious sexual crimes of sodomy and sexual abuse." *Tenant Screening Services*, 140 Or App at 51-52.

Thus, in both *McAlpine* and *Tenant Screening Services*, in concluding that there was no liability under general foreseeability principles, we emphasized the third-party tortfeasor's criminal history. Because the third party's ultimate tortious conduct was qualitatively different from his prior acts, the harm resulting from that conduct was not reasonably foreseeable to the defendant. Where, however, the defendant can reasonably foresee likelihood of specific criminal conduct by a third party in light of the third party's criminal history and the defendant's knowledge of that history,

the realization of that foreseeable likelihood cannot be deemed "intervening" or "supervening" causation that somehow precludes liability.[23] We therefore conclude that our general foreseeability analysis in a negligent supervision claim properly turns on whether—in light of the third party's criminal history—the defendant could reasonably foresee that the third party, if inadequately supervised, would engage in the kind of criminal conduct that ultimately harmed the plaintiff.

■■     That reasoning is dispositive here. Defendant had reason to foresee that Brown, if inadequately supervised, was likely to engage in violent sex crimes. Brown had twice been convicted of crimes involving violence against women. DOC was well aware of Brown's history of violent assaults on women and his sexual fantasies regarding female bondage, and, particularly, of District Attorney Sandrock's warning that "unless [Brown] has undergone a remarkable transformation in prison, he will remain a potential mutilator and killer of women." Parole Officer Wibbenmeyer was assigned to supervise Brown because Brown was considered a potentially violent sex offender. Wibbenmeyer testified that, after meeting with Brown in April, he was not confident that Brown's claims of rehabilitation were genuine. Nevertheless, and as found by the trial court, DOC failed to closely and carefully monitor Brown's whereabouts, including after it knew, or reasonably should have known, that Brown had absconded.[24] Ultimately, Brown committed exactly the kind of heinous crimes that Sandrock had warned of. The harm that plaintiffs suffered was a reasonably foreseeable consequence of defendant's inadequate supervision of Brown.

> Affirmed.

---

[23] *Cf. Cunningham v. Happy Palace, Inc.*, 157 Or App 334, 970 P2d 669 (1998) (citing *Buchler* for the proposition that a defendant "cannot be held liable for *all* intervening criminal conduct that might conceivably occur because of defendant's acts or failures to act," but *can* be held liable for the criminal act of a third party where (1) the defendant's conduct did more than merely facilitate the criminal act, and (2) the criminal act of the third person was a reasonably foreseeable consequence of the defendant's conduct).

[24] *See* 159 Or App at 215 n 13.

**DE MUNIZ, P. J.,** concurring.

Given the way the parties have raised and framed the issues,[1] the majority's result is correct. I write separately to express my view that, in cases like this, involving liability for the tortious acts of third parties, liability should be determined *solely* by reference to the standards described in the *Restatement (Second) of Torts*, sections 315 and 319 (1965), without reference to any alternative theory of "reasonable foreseeability."

Section 315 of the *Restatement* provides:

> "There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless
>
> "(a)   a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or
>
> "(b)   a special relation exists between the actor and the other which gives to the other a right to protection."

Section 319 describes one "special relation" that gives rise to an exception to the general rule of section 315:

> "One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm."

Thus, section 315 describes a general rule of *non*liability, subject to a few specifically defined exceptions. To hold that a party who cannot establish the existence of a "special relation" under section 319 can, nevertheless, prevail under a theory of general foreseeability, defeats the general principle of nonliability expressed in section 315. *See Buchler v. State of Oregon*, 316 Or 499, 505, 853 P2d 798 (1993) ("It appears that liability under section 319 is an exception to a general rule of non-liability for the conduct of others.").

Moreover, permitting plaintiffs who cannot prevail under section 319 to recover under open-ended principles of

---

[1] *See* 159 Or App at 221 n 20.

reasonable foreseeability makes no sense legally or practically. Why would, or should, a plaintiff ever attempt to establish liability under the strictures of section 319 when the benign "reasonable foreseeability" under *Fazzolari v. Portland School Dist. No. 1J*, 303 Or 1, 734 P2d 1326 (1987), is available?

I acknowledge that, in *Faverty v. McDonald's Restaurants*, 133 Or App 514, 892 P2d 703 (1995), *rev den* 326 Or 530 (1998), a majority of this court took the contrary view in an analogous context—*i.e.*, that notwithstanding section 315 and the plaintiff's failure to prove the existence of a "special relation" between the defendant employer and the tortfeasing employee under *Restatement (Second) of Torts* section 317,[2] the plaintiff could, nevertheless, prevail under principles of general foreseeability:

> "The linchpin of defendant's argument is section 315, which states a general rule of nonliability for failing to control the conduct of third persons. It applies to all persons, unless a special relation gives rise to a duty to control the conduct of the third person. By demonstrating that the special relation exception does not apply in this case, defendant asserts that it is entitled to rely on the general rule of nonliability stated in section 315. The linchpin, however, will not support the weight of defendant's argument.

> "Accepting, for the sake of argument, that section 317 does not apply, defendant is not entitled to limit its duty to plaintiff by invoking section 315. The limitation of section 315 does not arise out of any particular status, relationship

---

[2] Section 317 provides:

"A master is under a duty to exercise reasonable care so to control his servant while acting outside the scope of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if

"(a) the servant

"(i) is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant, or

"(ii) is using the chattel of the master, and

"(b) the master

"(i) knows or has reason to know that he has the ability to control his servant; and

(ii) knows or should know of the necessity and opportunity for exercising such control."

or statutory standard of conduct. It is a standard that, according to the *Restatement (Second) of Torts*, applies to all persons. However, under *Fazzolari*, unless a defendant invokes a special status or relationship, or is subject to the general duty to avoid conduct, it is subject to the general duty to avoid conduct that unreasonably creates a foreseeable risk of harm to a plaintiff. *Fazzolari*, 303 Or at 17; *see also Fuhrer v. Gearhart By The Sea, Inc.*, 306 Or 434, 438, 760 P2d 874 (1988)." *Faverty*, 133 Or App at 523 (footnote omitted).[3]

That analysis was wrong. Nothing in *Fazzolari* suggests that its bifurcation of "special status or relationship" and "reasonable foreseeability" was meant to apply in the face of a general rule of *non*liability. Recognition of the rule of nonliability necessarily limits a plaintiff's ability to recover to those circumstances falling within explicit exceptions to that rule—*and no others*. When the occasion next arises, we should revisit and repudiate *Faverty's* analysis.

---

[3] In *Faverty*, I joined in the dissent and continue to view Judge Edmonds' analysis as correct.