Submitted on remand July 11, 2002, affirmed June 26, 2003

Sommuang PANPAT,
as Personal Representative for the
Estate of Achara Tanatchangsang,
*Respondent,*

*v.*

OWENS-BROCKWAY GLASS CONTAINER, INC.,
a Delaware corporation,
*Appellant,*

*and*

STANLEY-SMITH SECURITY,
a Texas corporation,
dba Wallace Security;
Wallace Prince,
individually and in his capacity as
Security Supervisor;
and A. J. Campbell,
individually and in his capacity as
a Security Officer,
*Defendants.*

OWENS-BROCKWAY GLASS CONTAINER, INC.,
a Delaware corporation,
*Third-Party Plaintiff,*

*v.*

ESTATE OF CHRIS A. BLAKE,
*Third-Party Defendant.*

9708-06234; A104501

71 P3d 553

Stephen M. Hankins, Lee Ann Huntington, Charles F. Adams, Andrew R. Gardner, Morgenstein & Jubelirer LLP and Stoel Rives LLP, filed the brief for appellant.

Jana Toran and James Patrick McHugh, Jr., filed the brief for respondent.

Before Haselton, Presiding Judge, and Linder and Kistler, Judges.

KISTLER, J.

**KISTLER, J.**

This case is before us on remand from the Oregon Supreme Court. *Panpat v. Owens-Brockway Glass Container*, 334 Or 342, 49 P3d 773 (2002). In our previous opinion, we reversed the trial court's order granting plaintiff a new trial because of newly discovered evidence. *Panpat v. Owens-Brockway Glass Container*, 172 Or App 470, 479-80, 21 P3d 97 (2001). We reasoned that defendant was entitled to prevail on its summary judgment motion because the workers' compensation system provided plaintiff's exclusive remedy and that plaintiff's newly discovered evidence had no bearing on that issue. *Id.* The Supreme Court reversed, holding that the workers' compensation system did not preclude plaintiff from suing defendant for negligence. *Panpat*, 334 Or at 352. On remand, two interrelated issues remain. The first is whether defendant was entitled to summary judgment on the alternative ground that it could not reasonably foresee that its employee would physically harm plaintiff's decedent. The second is whether plaintiff was entitled to a new trial because of newly discovered evidence. Because we hold that defendant's summary judgment motion should have been denied,[1] we need not decide whether plaintiff's new trial motion should have been granted.

A number of the facts have been set forth at length in the two previous opinions. For purposes of evaluating the trial court's summary judgment ruling, we state the pertinent facts in the light most favorable to plaintiff. ORCP 47 C; *Jones v. General Motors Corp.*, 325 Or 404, 420, 939 P2d 608 (1997).[2]

---

[1] Although plaintiff did not cross-assign error to this ruling, *see* ORAP 5.57, she briefed the issue in her brief, defendant addressed it in its reply, and defendant conceded at oral argument that the summary judgment ruling was properly before us. Given defendant's concession and the parties' briefing, we treat plaintiff's brief as presenting a cross-assignment of error concerning the original summary judgment ruling. *See Artman v. Ray*, 263 Or 529, 534, 501 P2d 63 (1972).

[2] Defendant argues that the version of ORCP 47 C that went into effect in January 2000 applies. In *Robinson v. Lamb's Wilsonville Thriftway*, 332 Or 453, 460, 31 P3d 421 (2001), the court held that the later version of ORCP 47 C applied to actions pending in trial courts, but not to actions that already were on appeal, on its effective date. Because this case falls into the latter category, we apply the former summary judgment standard here.

The decedent, Achara Tanatchangsang, and her former boyfriend, Chris Blake, worked for defendant Owens-Brockway on the graveyard shift. Before November 1995, decedent and Blake lived together. In November 1995, decedent moved out of Blake's home and made repeated efforts to keep Blake from discovering her new address. Blake became depressed and began missing a significant amount of work. He entered an inpatient chemical dependency program, and defendant put him on medical leave. Senner, the company nurse who granted the medical leave, was aware that Blake also was having a problem with depression. Others at defendant's facility, including the plant superintendent, were aware that Blake was having difficulty coping with his breakup with decedent.

In January 1996, Blake sought to have decedent transferred to a different shift so that he would not have to work near her. Blake's supervisor Mobley attempted to accommodate his request so that Blake "through his counseling [could] get his problem under control[.]" Blake spoke with defendant's plant manager Couvillion, seeking to have decedent transferred because being on the same shift with her was "bothering him." Couvillion told Blake that he did not want "any verbal or physical confrontations," and Blake assured him that "there was no problem, he just would like her moved from that shift." In support of his request that decedent be transferred, Blake provided a letter from his chemical dependency counselor, stating that working close to decedent was causing Blake "quite a bit of stress." Management informed decedent of the proposed transfer, but decedent took the position that, if Blake had a problem, he should be transferred. She threatened to sue for discrimination if she were transferred because of Blake's problem. Blake did not wish to be transferred. Both remained on the graveyard shift. Defendant's management took no further steps to separate Blake from decedent.

Blake continued to have problems, missing a significant amount of work. He received considerable medical intervention between January and March 1996, including a psychiatric hospitalization due to suicidal ideation.[3] Blake

---

[3] There is evidence from which a reasonable juror could find that Mobley and Senner were aware of that hospitalization.

made several suicide attempts. In late January and again in early March, decedent reported to her supervisor Mobley that Blake had called her obscene names during their shift. After the March incident, Mobley told Blake that he "would not tolerate this kind of conduct." Blake worked only sporadically in March 1996, calling in sick or being on medical leave throughout most of the month. In April 1996, he called in sick through the first week of the month, after which Senner put him on medical leave. On April 8, Blake communicated to Senner that his physician would not authorize him to return to work until he had been seen by a psychiatrist or psychologist. Senner received a telephone message from Blake's physician requesting that Senner call him "first thing" on April 15, but Senner did not do so. On April 15, Blake told Senner that he would not be seen by a mental health specialist until April 29, and she extended his medical leave.

Shortly after midnight on April 26, Blake entered defendant's facility. He walked past a guard, who recognized him as an employee but was not aware that he was on medical leave. Blake approached decedent and took her into a bathroom at gunpoint. A coworker notified a supervisor, who had the guard call the police. After the police arrived and ordered Blake out of the bathroom, Blake shot decedent three times and himself once. Both died as a result of their wounds.

In this wrongful death action, plaintiff alleged that defendant was negligent in failing to provide adequate security to protect decedent from Blake at her workplace. In particular, plaintiff alleged that defendant negligently created a foreseeable risk of harm to decedent:

"(a)    In failing to instruct security officers to refuse entry to Blake;

"(b)    In failing to provide training to security officers regarding [employer's] policies;

"(c)    In failing to provide [decedent] security despite knowledge that Blake posed a substantial risk of harm to her;

"(d)    In failing to intervene when notified [decedent] was being held at gunpoint;

"(e) In allowing a visibly intoxicated person to enter the facility; and, or

"(f) After observing Blake's presence, by failing to direct him to exit the premises."

Defendant moved for summary judgment on the ground that defendant neither knew nor should have known that Blake posed any danger to decedent. In support of its motion, defendant provided depositions from individuals in management positions, stating that, although they were aware of the breakup and of Blake's desire to have decedent removed from his shift, they had no knowledge that Blake posed a threat to decedent.

Plaintiff responded with the evidence discussed above concerning Senner's knowledge of Blake's psychiatric problems, Mobley's knowledge that Blake had called decedent obscene names on the job, and management's knowledge that Blake wanted decedent moved from the shift he was on. Plaintiff produced evidence that defendant had a rule that employees are not permitted into the work area unless they were scheduled to work or had a pass signed by an authorized person and that Blake had been permitted to enter the facility in violation of that rule on the day of the shooting. Plaintiff also produced evidence that defendant knew that Blake had experienced similar mental problems after the breakup of his marriage several years before: He had anger control problems and anxiety after separating from his wife with whom he had worked at defendant's facility and needed psychological treatment before he could return to work. He was diagnosed with an intermittent explosive disorder. He and his former wife had mutual restraining orders against each other.[4] Finally, plaintiff provided her counsel's affidavit, which stated, in pertinent part, that a qualified expert had been retained who would testify to admissible facts or opinions creating questions of fact. *See* ORCP 47 E.

The trial court granted defendant's motion for summary judgment. The trial court noted initially that evidence

---

[4] There are disputed issues of fact as to whether defendant received information from its Employee Assistance Program provider concerning these matters.

that decedent had told defendant's management that Blake had threatened her with a gun was inadmissible hearsay.[5] The court then reasoned that plaintiff's evidence of a mutual restraining order between Blake and his former wife, of Senner's knowledge of Blake's mental problems, and of defendant's knowledge that Blake wished to have decedent moved from his shift were insufficient as a matter of law to create a genuine issue of material fact as to whether Blake's actions on the night of the shootings were foreseeable. Focusing on the fact that decedent had not wanted to change shifts, the trial court reasoned that, "[i]f plaintiff's deceden[t] was not fearful of Blake, there is no reason to expect her employer, Owens-Brockway, to have any knowledge of the need to control Blake with regard to any question of possible future violence against plaintiff's decedent." Finally, the trial court rejected plaintiff's attorney's ORCP 47 E affidavit concerning the availability of an expert to testify. The court reasoned that the present case "does not require the opinion of an expert to determine whether [Defendant] knew or should have known of the need to control Chris Blake."

On appeal, the parties differ over the applicable legal standard. Relying on *Davis v. Weyerhaeuser Co.*, 231 Or 596, 373 P2d 985 (1962), and *Buchler v. Oregon Corrections Div.*, 316 Or 499, 853 P2d 798 (1993), defendant contends that this case is governed by section 317 of the *Restatement of Torts*. Plaintiff responds that, under *Fazzolari v. Portland School Dist. No. 1J*, 303 Or 1, 13, 734 P2d 1326 (1987), the relevant question is whether Blake posed a risk of danger to decedent that was or should have been reasonably foreseeable. This is not the first time that we have considered this issue. In *Faverty v. McDonald's Restaurants*, 133 Or App 514, 523, 892 P2d 703 (1995), *rev dismissed*, 326 Or 530 (1998), we interpreted *Buchler* to stand for the proposition that, even if an employer is not liable for the intentional acts of its employee under section 317, it still is "subject to the general duty [recognized in *Fazzolari*] to avoid conduct that unreasonably creates a foreseeable risk of harm to a plaintiff." We have adhered to that understanding of *Buchler* despite the apparent tension in *Buchler*'s reasoning. *See*

---

[5] That ruling is not at issue on appeal.

*McAlpine v. Multnomah County*, 166 Or App 472, 481, 999 P2d 522 (2000); *Washa v. DOC*, 159 Or App 207, 979 P2d 273 (1999), *aff'd by an equally divided court*, 335 Or 403, 69 P3d 1232 (2003).[6] We continue to do so.

Two of our decisions inform our analysis of foreseeability when the harm is caused by the criminal acts of a third party. In *Washa*, we concluded that the third party's history of violence, at least insofar as it was or should have been known to the defendant, plays an important role in determining whether the harm was reasonably foreseeable. 159 Or App at 224. We stated:

"Where * * * the defendant can reasonably foresee likelihood of specific criminal conduct by a third party in light of the third party's criminal history and the defendant's knowledge of that history, the realization of that foreseeable likelihood cannot be deemed 'intervening' or 'supervening' causation that somehow precludes liability. We therefore conclude that our general foreseeability analysis in a negligent supervision claim properly turns on whether—in light of the third party's criminal history—the defendant could reasonably foresee that the third party, if inadequately supervised, would engage in the kind of criminal conduct that ultimately harmed the plaintiff."

*Id.* at 224-25. Applying that test to the facts in *Washa*, we concluded that, in light of the defendant's knowledge of the tortfeasor's history of violent behavior, the plaintiff's harm "was a reasonably foreseeable consequence of defendant's inadequate supervision of [the tortfeasor]." *Id.*

We also have recognized that, in addition to the knowledge of the tortfeasor's propensity for violence, foreseeability can turn on whether the plaintiff has been placed in a vulnerable situation. *Cunningham v. Happy Palace, Inc.*, 157 Or App 334, 970 P2d 669 (1998), *rev den*, 328 Or 365 (1999). In *Cunningham*, the plaintiff was a patron at the defendant's

---

[6] In *Washa*, we explained that the defendant had failed to preserve the claim that, in the absence of a specific duty under section 319 of the *Restatement (Second) of Torts*, it did not owe a general duty to the plaintiff to avoid foreseeable risks of harm caused by third parties. 159 Or App at 221 n 20. Judge De Muniz concurred because of the way that the parties had raised and framed the issues. *Id.* at 226 (concurring opinion). He questioned, however, whether our decision in *Faverty* was correctly decided. *Id.* at 228.

bar and became intoxicated while drinking there one evening. One of the defendant's employees told the plaintiff she had to leave and escorted her outside without letting her make a telephone call. 157 Or App at 337. The plaintiff attempted to hitchhike but was picked up and sexually assaulted by three men. *Id.* The plaintiff alleged, as pertinent here, that the defendant was negligent in ejecting her from the bar into a position of danger. *Id.* at 336. In analyzing foreseeability, we stated:

"A dispute in a negligence action about whether an injury was foreseeable generally presents an issue of fact and, therefore, is not a likely candidate for summary judgment. There are some cases, however, in which no reasonable factfinder could find the risk of harm to be reasonably foreseeable. * * *

"The dispositive issue in this case is whether, by forcing plaintiff to leave the bar before she could telephone her daughter for a ride home, it was foreseeable that defendant was placing plaintiff in harm's way. If it were reasonably foreseeable that plaintiff would come to harm as a result of criminal acts by others, then defendant can be held liable for that harm."

*Id.* at 337-38 (citations omitted). We held that the defendant's conduct constituted more than "mere facilitation" of the harm to the plaintiff. We relied, in particular, on evidence that the defendant knew that intoxicated people were impaired and thus more likely to be injured or be victims of crime and on the plaintiff's ORCP 47 E affidavit, which asserted that she "was prepared to offer expert testimony on whether it was reasonably foreseeable that a person in her circumstances would become the victim of a crime." *Id.* at 339-40.

With those precedents in mind, we turn to the question whether summary judgment was appropriate on this record. We note that, as an initial matter, foreseeability is generally regarded as a question of fact, and the issue is "not a likely candidate for summary judgment." *Cunningham*, 157 Or App at 337. In addition, plaintiff here, like the plaintiff in *Cunningham*, offered an affidavit in accordance with ORCP 47 E in opposition to summary judgment. Because that affidavit did not specify the issues on which the expert

would testify, we must assume that the expert will testify "on every issue on which summary judgment is sought." *Metropolitan Property & Casualty v. Harper*, 168 Or App 358, 364, 7 P3d 541 (2000). We assume that the expert would testify that a reasonable medical professional, such as Senner, would have recognized from the warning signs that were present here that Blake was likely to physically harm decedent. Expert testimony concerning what defendant's professional employee should have understood about the danger that Blake posed to decedent could be helpful to the trier of fact.

The issue, then, is whether there is a genuine issue of material fact concerning foreseeability. For the following reasons, we conclude that there is. Although plaintiff presented no admissible evidence at summary judgment that defendant knew that Blake had committed crimes of violence against decedent, a jury could find that defendant nevertheless did have some significant knowledge from which it reasonably could have inferred that Blake posed a danger to decedent. Defendant knew that Blake had a history of mental illness that included an intermittent explosive disorder.[7] That disorder came to defendant's attention in the context of Blake's breakup with his former wife, who was also employed by defendant. Defendant also knew that a mutual restraining order had issued as a result of Blake's problems with his former wife. From those facts, a jury could find that defendant knew or should have known that there was a potential for explosive violence between Blake and his former wife some eight years before the present injury occurred.

Defendant knew that Blake was having difficulty coping with his breakup with decedent in November 1995. Defendant knew that, at about the same time, Blake was suffering from depression and required inpatient treatment in a chemical dependency program. Given the timing, a jury could find that defendant knew or should have known that the depression, the substance abuse, and the breakup with decedent were related. From Blake's attempts to have decedent

---

[7] We reiterate that, in stating what defendant "knew," we state the historical facts in the light most favorable to plaintiff.

removed from her work shift in January 1996, defendant knew that Blake had ongoing problems dealing with decedent and that working near decedent caused Blake "quite a bit" of stress. In fact, defendant attempted to accommodate Blake by removing decedent so that Blake could "get his problem under control[.]" Despite a warning by the plant manager against any verbal or physical confrontations, Blake, on two occasions, engaged in verbal confrontations with decedent, one as recently as March 1996. When Blake was on medical leave in April 1996, defendant knew that his physician would not authorize him to return to work until he had seen a psychiatrist or psychologist.

In short, a reasonable juror could find that defendant knew (1) that it had an employee who had previously been diagnosed with an explosive disorder in conjunction with the breakup of a romantic relationship with a coemployee; (2) that the employee was on a medical leave due to mental health problems related to the breakup of a romantic relationship with another coemployee; (3) that the employee was not authorized to return to work until he received further mental health evaluation; (4) that the employee had made attempts to have the coemployee removed from her position on the same shift that he worked; (5) that the employee had engaged in obscene verbal confrontations with the coemployee on two occasions, despite warnings by management that such confrontations would not be tolerated.[8] Given those facts, we are unable to say that the harm to plaintiff's decedent was not foreseeable as a matter of law, particularly in light of the testimony that we must assume that plaintiff's expert would have provided. On this record, a jury could find that defendant reasonably should have foreseen that allowing an employee who was on a psychiatric medical leave and who was not authorized to be in the workplace to approach the coemployee around which the

---

[8] In granting summary judgment, the trial court was persuaded that defendant should not be expected to have foreseen that Blake was a danger to decedent when decedent "was not fearful of Blake." That fact may be persuasive to a jury and may ultimately carry the day for defendant, but a defendant's liability for negligence does not turn, as a matter of law, on whether the plaintiff also fails to perceive the risk.

employee's psychiatric problems revolved "plac[ed the coemployee] at risk of criminal assault[.]" *Cunningham,* 157 Or App at 340.[9] Because defendant's motion for summary judgment on the issue of foreseeability should have been denied, we affirm the trial court's ultimate conclusion that plaintiff was entitled to present her case to the jury.

Affirmed.

---

[9] We note that we would reach the same conclusion if we analyzed, under section 317 of the *Restatement of Torts,* whether a jury reasonably could find that defendant "knows or should know of the necessity and opportunity for exercising * * * control" over Blake.