Argued and submitted July 6, 2006, reversed and remanded January 31, 2007

Bertha McPHERSON,
*Plaintiff-Appellant,*

*v.*

STATE OF OREGON,
acting by and through
DEPARTMENT OF CORRECTIONS,
acting by and through
Oregon State Correctional Institution,
and acting by and through
Oregon State Police;
Jim Bartlett; Greg Kanne;
Brian J. Bemus; Jeff Hanson; Lawrence E. Daniels;
John Doe 1; John Doe 2;
Paul W. Scharn; Julian T. Ruiz; Edward J. Shones;
Marion County,
acting by and through
Marion County Sheriff's Office;
City of Salem,
acting by and through
Salem Police Department;
Troy Bowser; Patrick Tope;
Jamin Dumas; and James Pate,
*Defendants-below,*
*and*

Ronald HALTER,
dba Lancaster Gardens
and Janet Halter,
dba Lancaster Gardens,
*Defendants-Respondents.*

Marion County Circuit Court
02C-20767; A126885 (Control)

Charles McPHERSON,
*Plaintiff-Appellant,*

*v.*

STATE OF OREGON,
acting by and through
DEPARTMENT OF CORRECTIONS,
acting by and through
Oregon State Correctional Institution,

and acting by and through
Oregon State Police;
Jim Bartlett; Greg Kanne;
Brian J. Bemus; Jeff Hanson; Lawrence E. Daniels;
Paul W. Scharn; Julian T. Ruiz; Edward J. Shones;
Marion County,
acting by and through
Marion County Sheriff's Office;
City of Salem,
acting by and through
Salem Police Department;
and John Doe 1 and John Doe 2,
*Defendants-below,*
*and*

Ronald HALTER,
dba Lancaster Gardens
and Janet Halter,
dba Lancaster Gardens,
*Defendants-Respondents.*

Marion County Circuit Court
02C-20876; A126886

152 P3d 918

Thomas W. Sondag argued the cause for appellants. With him on the briefs was Lane Powell PC.

Marjorie Speirs argued the cause for respondents. With her on the brief was Janet M. Schroer.

Before Landau, Presiding Judge, and Schuman and Ortega,* Judges.

SCHUMAN, J.

---

* Ortega, J., *vice* Richardson, S. J.

**SCHUMAN, J.**

On Christmas eve, 2001, an escaped convict named Leighton Bates entered a stand-alone laundry shed in Lancaster Gardens, a Salem apartment complex owned by defendants, where he restrained, assaulted, and repeatedly raped plaintiff Bertha McPherson. He also restrained and assaulted her teenaged son, plaintiff Charles McPherson. Plaintiffs each brought an action alleging that defendants were negligent in failing to provide safe premises.[1] Defendants moved for summary judgment. The trial court granted the motions, ruling that "there is no evidence that the defendants could have reasonably foreseen" the harm that occurred to plaintiffs. The cases were consolidated for appeal. We reverse and remand.

In the light most favorable to plaintiffs, ORCP 47 C, the facts are as follows. At some time on December 24, 2001, Bates escaped from the Oregon State Correctional Institution near Salem. As evening fell, he found himself, still in his prison uniform, near Lancaster Mall, a brightly lit shopping center adjacent to Interstate 5. Looking for a car to steal and noticing a dimly lit nearby apartment complex, Bates walked over a downed fence at the edge of the complex and entered its parking lot. The complex was Lancaster Gardens, owned by defendants.

Lancaster Gardens is located in an area of Salem that defendants know to be unsafe. Two halfway houses are in the neighborhood. Transients are a common sight and sometimes trespass into the complex. Tenants near or within the complex made 86 emergency calls to police during the nine years preceding the attack on plaintiffs, some dealing with incidents that involved the threat of physical harm. Events reported within three years of the attack included gunshots, car break-ins, thefts, and trespasses.

---

[1] When filed, the cases also named the state, Marion County, the City of Salem, and various individuals and agencies as defendants. The state settled with plaintiffs and the court dismissed it, along with all of the other defendants except the Halters, by means of a limited judgment. The only remaining defendants are the Halters, and "defendants" in this opinion refers only to them.

Before the date of the attacks on plaintiffs, the managers of the complex had made several police reports about activity inside its boundaries, including a report of vandalism and trespass in its laundry facility. Indeed, the manager testified that criminal activity in the laundry rooms was "not an unusual thing," and tenants had reported to management that they felt unsafe in those areas. According to the landlord education program conducted by the Salem Police Department—a program that neither defendants nor their managers had attended—laundry rooms "should contain a window on the same wall as the door, so that a tenant occupying the facility can see people approaching or at the door without opening it." One of the laundry rooms at Lancaster Gardens was a free-standing shed located in the parking lot. The only door into the shed had a lock, but no security chain. There was no window on the same side as the door through which an occupant could observe who might want to come in, nor was there a peephole. The shed did, however, have a window on another side.

After he entered the complex, Bates observed Ms. McPherson through that window. She was working on several loads of wash and expecting her son, Charles, to come by to help her carry the clean clothes back to their apartment. Thus, when Bates knocked on the door, Ms. McPherson thought it was probably Charles. To be certain, however, and because there was neither a window nor a peephole, she opened the door a few inches and braced it with her foot; she did not ask who it was because she thought that any conversation would be drowned out by the sound of the laundry machines. Had she been able to see that the person knocking was a strange man, she would not have opened the door even a few inches.

In the event, she could not see who was knocking without opening the door, and when she opened it, Bates pushed his way in; his force overpowered Ms. McPherson's foot. He entered, jabbed her with a sharpened stick, and demanded her car. Ms. McPherson gave him her car keys and indicated which car was hers but, for some reason, Bates was not satisfied. He turned off the lights and hit her in the face, then wrestled her to the floor and held the sharpened stick to her jaw.

At that point, Charles arrived. He knocked and, when nobody answered, called out to his mother. When she did not respond, he tried to open the door with his key, but Bates was blocking it shut. After a moment, Bates led Ms. McPherson out of the shed, holding her around the neck and midsection. Bates then ordered plaintiffs to take him to their apartment. Once there, Bates bound Charles and put him in the bathroom and told him that if he tried to get out his mother would be killed. Bates then raped Ms. McPherson.

When he was done, he took plaintiffs back to the laundry shed, where he picked up clothing so that he could change out of his prison uniform. All three then returned to the apartment and, around 10:00 p.m., went back to the laundry shed to look for Ms. McPherson's glasses, which had been knocked off earlier. While they were in the shed, with the lights on and the door opened, the apartment managers drove up in their van and looked inside. Bates slammed the door. The managers then drove around to the side and, while still seated in the van, looked in the window for several minutes. They did not leave their van or call authorities.

After the managers drove away, Bates took the McPhersons back to their apartment, where he once again raped Ms. McPherson. The next morning, after forcing Ms. McPherson to lie next to him all night, he forced her to drive him to a nearby state park. When they arrived, he fled.

Plaintiffs subsequently filed separate actions, alleging that defendants or their employees were negligent in several particulars, including: failing to provide a safe laundry shed with a security chain, peephole, or window; failing to keep a proper lookout for trespassers; failing to properly light the area; failing to provide safe landscaping; failing to warn plaintiffs about trespassers; and failing to provide adequate security. As noted above, defendants moved for summary judgment and the trial court granted it. This appeal followed.

We can affirm the trial court's grant of summary judgment only if the record, viewed in the light most favorable to plaintiffs, presents no disputed issues of material facts, and the undisputed facts entitle defendants to prevail as a matter of law. ORCP 47 C. As they did below, plaintiffs contend that, on the facts in the record, a reasonable juror

could conclude that defendants breached their duty, as landlords, by unreasonably exposing tenants to a risk of foreseeable harm of the type that befell plaintiffs. Defendants' response has three parts. First, they contend that no reasonable juror could find that they were the cause in fact of plaintiffs' injuries—they contend, in other words, that no reasonable juror could conclude that, *but for* defendants' conduct, no injury would have occurred. *See Oregon Steel Mills, Inc. v. Coopers & Lybrand, LLP*, 336 Or 329, 339, 83 P3d 322 (2004) (explaining role of "but for" causation in negligence action). Second, they argue that, even if defendants' conduct was the "but for" cause of plaintiffs' harm, defendants were entitled to summary judgment in any event. That is so, they reason, because, on the basis of the undisputed fact that plaintiffs were directly harmed not by defendants' conduct but by Bates's crime, no other facts are "material" and defendants prevail as a matter of law. *Buchler v. Oregon Corrections Div.*, 316 Or 499, 511-12, 853 P2d 798 (1993). Finally, they argue that, even if Bates's criminal act did not by itself compel summary judgment, the other facts in the record do not raise a disputed issue bearing on defendants' liability and, on the basis of those facts, no rational juror could conclude that defendants were liable because no rational juror could conclude that the type of harm that befell plaintiffs was reasonably foreseeable. *Fazzolari v. Portland School Dist. No. 1J*, 303 Or 1, 17, 734 P2d 1326 (1987). We conclude a reasonable juror could conclude that, but for defendants' conduct, no harm would have befallen plaintiffs; that Bates's criminal act does not by itself necessarily insulate defendants from liability; and that a reasonable juror could find that defendants should have foreseen harm of the type that befell plaintiffs and reasonably could have taken more measures to prevent it than they did.

Plaintiffs base their "but-for" causation argument on two facts: first, that Bates would not have entered Lancaster Gardens but for the fact that it was dimly lit; and second, that Bates could not have gained entrance to the laundry shed but for the fact that it had neither a peephole, door-side window, nor security chain. Regarding the first argument, Bates testified, "When I crossed [I-5], I saw that that whole portion of

town was darker, then looked down and saw that the apartment complex was even darker still." From that statement, a rational juror could conclude that, if the complex had been better lit, Bates would not have entered. Regarding the second argument, Ms. McPherson testified that, when she heard a knock on the door of the laundry shed, she thought that it was her son and that, had she seen that it was a man wearing prison clothes, she would not have opened the door. She further testified that she opened the door a few inches in order to see who was knocking and that, when she did, Bates forced his way in. From those facts, a rational juror could conclude that Bates would not have been able to enter the shed if defendants had installed a peephole, door-side window, or security chain. We conclude that ample evidence in the record viewed in the light most favorable to plaintiffs supports the theory that, but for defendants' failure adequately to light the complex or equip the laundry shed, plaintiffs would not have been injured as they were.

■    We therefore turn to the second step in our inquiry, the contours of which are framed as follows in *Fazzolari*, 303 Or at 17:

> "[U]nless the parties invoke a status, a relationship, or a particular standard of conduct that creates, defines, or limits the defendant's duty, the issue of liability for harm actually resulting from defendant's conduct properly depends on whether that conduct unreasonably created a foreseeable risk * * * of the kind of harm that befell the plaintiff."

Did defendants, in other words, have a specific duty based on their status as plaintiffs' landlords to take reasonable steps to protect them from harm? If so, what was the scope of that duty? If not, was the harm nonetheless reasonably foreseeable?

In *Dikeman v. Carla Properties, Ltd.*, 127 Or App 53, 59-60, 871 P2d 474 (1994), we held that the relationship between a landlord and tenant was the kind of special relationship that, under *Fazzolari*, should be analyzed according to the landlord's duty as opposed to general foreseeability. We also held, in *Thompson v. Klimp*, 101 Or App 127, 130, 789 P2d 696 (1990), that a possessor of land has a "special

relationship" with an invitee or licensee "that takes the claim out of the generalized standards of common law negligence." We therefore conclude that this case requires us to determine the scope of defendants' particular duty based on their status or their relationship to plaintiffs and not, at least in the first instance, on the scope of their generic duty to avoid unreasonable risk of foreseeable harm.

In addressing that inquiry, we note first that, in cases before *Fazzolari*, Oregon courts held that a possessor of premises has a duty to protect tenants or invitees from reasonably foreseeable criminal acts of third persons. *Uihlein v. Albertson's, Inc.*, 282 Or 631, 639, 580 P2d 1014 (1978) (store owner has duty to patron); *Torres v. United States Nat. Bank*, 65 Or App 207, 211, 670 P2d 230, *rev den*, 296 Or 237 (1983) (bank to patron); *Kutbi v. Thunderlion Enterprises*, 73 Or App 458, 698 P2d 1044, *rev den*, 299 Or 584 (1985) (innkeeper to guest). We have also held that, for purposes of determining the scope of duties in "special relationship" cases, "pre-existing case law has survived *Fazzolari*." *Thompson,* 101 Or App at 130.

Further, nothing since *Fazzolari* calls into question the earlier cases. In *Dikeman,* we noted:

"To ascertain the duty of care that is owed by a landlord to a tenant in a particular factual circumstance, we have generally looked to the *Restatement (Second) [of] Torts* (1965) for its definitions of standards of conduct. Although wholesale reliance on the *Restatement* is no longer the practice in Oregon, it still may provide guidance."

127 Or App at 60; *accord Park v. Hoffard,* 315 Or 624, 629, 847 P2d 852 (1993) ("This court has looked to definitions of standards of conduct in the American Law Institute's Restatements of the Law to help define duty[.]"). We then cited section 360 of the *Restatement (Second) of Torts* for the following proposition:

" 'A possessor of land who leases a part thereof and retains in his own control any other part which the lessee is entitled to use as appurtenant to the part leased to him, is subject to liability to his lessee * * * for physical harm caused by a dangerous condition upon that part of the land retained in the lessor's control, if the lessor by the exercise

of reasonable care could have discovered the condition and the unreasonable risk involved therein and could have made the condition safe.' "

*Dikeman*, 127 Or App at 61 (quoting *Restatement (Second) of Torts* § 360 (1965)). We also noted that section 17.3 of *Restatement (Second) of Property*, Landlord & Tenant (1977) was relevant. That section provides:

"A landlord who leases a part of his property and retains in his own control any other part the tenant is entitled to use as appurtenant to the part leased to him, is subject to liability to his tenant * * * for physical harm caused by a dangerous condition upon that part of the leased property retained in the landlord's control if the landlord by the exercise of reasonable care could have:

"(1) discovered the condition and the unreasonable risk involved therein; and

"(2) made the condition safe."

*Dikeman*, 127 Or App at 61.

One of the "Comments" to section 17.3—a comment not relevant to the facts in *Dikeman* and not cited therein, but relevant to this case—states:

"*l. Criminal intrusion.* For the purpose of this section, the unreasonable risk of harm from criminal intrusion constitutes a dangerous condition, so that where the landlord could by the exercise of reasonable care have discovered the unreasonable risk of criminal intrusion and could have made the condition safe from such unreasonable risk of criminal intrusion, he is subject to liability for physical harm caused by criminal intrusion if he has not taken the necessary precautions."

That "Comment" is illustrated as follows:

"L leases an apartment to T in an area of increasing crime, providing secure common areas at the time of the lease. Subsequently L stops providing constant doorman service, constant desk attendants, and frequently leaves an entrance to the building unlocked at night. A criminal intruder assaults and robs T. L knows of the unreasonable risk and has failed to exercise reasonable care in making the common areas reasonably safe. L is subject to liability to T."

*Restatement (Second) of Property*, Landlord and Tenant § 17.3, Illustration 18.

As noted in both *Dikeman* and *Park*, the restatements are not part of Oregon law. As also noted, however, they are relevant and helpful. One reason for their relevance and utility is that they are descriptive *restatements* of the law, that is, the drafters' attempts to organize and, in a sense, to codify existing common-law rules. The restatements that describe the duty of landlords to protect tenants from criminal activity on the landlord's premises by third persons are no exception. As the Supreme Court of Arizona has correctly noted, "[S]ince 1970 courts have recognized the landlord's duty of care may include measures to protect others from criminal attacks, provided the attacks are reasonably foreseeable and preventable." *Martinez v. Woodmar IV Condominiums Homeowners' Association, Inc.*, 189 Ariz 206, 211, 941 P2d 218 (Ariz 1997) (citing W. Page Keeton et al, *Prosser & Keeton on the Law of Torts* § 63, 442-43 (5th ed 1984) (citing cases)). We find the Arizona court's explanation persuasive:

> "If one owes a duty of reasonable care to those on one's land with permission, then the circumstances will dictate what is reasonable to protect others from foreseeable and preventable danger. The category of danger neither creates nor eradicates duty; it only indicates what conduct may be reasonable to fulfill the duty."

*Martinez*, 189 Ariz at 222-23.

■ In sum, we conclude that a landlord has a common-law duty to take reasonable steps to protect tenants in the property's common areas from reasonably foreseeable criminal acts by third persons. That conclusion follows from our own case law (*Uihlein*, *Torres*, and *Kutbi*), which itself reflects a well-settled consensus as reported in various restatements.

There is language in *Buchler*, 316 Or at 511-12, that could be interpreted to mean that the defendant in a tort case cannot be liable, as a matter of law, for harm caused by the intervening criminal activity of a third party:

> "[I]n a general sense, it is foreseeable that anyone whose conduct may in any way facilitate the criminal in committing the crime has played some part in the resulting harm. But mere 'facilitation' of an unintended adverse result, where intervening intentional criminality of another person is the harm-producing force, does not cause the harm so as to support liability for it."

That language does not control the present case, however, for two reasons. Most obviously, the scope of a common-law duty based on status or special relationship is "creat[ed]" and "defin[ed]" by, and therefore particular to, the status or relationship itself. *Fazzolari*, 303 Or at 17; *accord Cain v. Rijken*, 300 Or 706, 717, 717 P2d 140 (1986); *Allstate Ins. Co. v. Tenant Screening Services, Inc.*, 140 Or App 41, 50, 914 P2d 16 (1996). Second, we have consistently interpreted *Buchler* to mean that, even in the absence of a special relationship, intervening criminal activity insulates a defendant only from *unforeseeable* consequences of an unreasonable risk. *See, e.g., Panpat v. Owens-Brockway Glass Container*, 188 Or App 384, 391-94, 71 P3d 553 (2003); *Sande v. City of Portland*, 185 Or App 262, 272-74, 59 P3d 595 (2002); *McAlpine v. Multnomah County*, 166 Or App 472, 482, 999 P2d 522 (2000), *rev den*, 336 Or 60 (2003); *Washa v. DOC*, 159 Or App 207, 222-25, 979 P2d 273 (1999), *aff'd by an equally divided court*, 335 Or 403, 69 P3d 1232 (2003); *Cunningham v. Happy Palace, Inc.*, 157 Or App 334, 337-39, 970 P2d 669 (1998), *rev den*, 328 Or 365 (1999).

We therefore must now turn to whether, on the undisputed facts viewed in the light most favorable to plaintiff, no reasonable juror could conclude that the attacks on plaintiffs were the reasonably foreseeable consequences of defendants' acts or omissions. We emphasize at the outset of this inquiry that, given the posture of this appeal, defendants face a formidable obstacle. Ordinarily, foreseeability is a fact question for the jury. Long before *Fazzolari*, the Supreme Court explained the theory underlying that rule:

> "Foreseeability is an element of fault; the community deems a person to be at fault only when the injury caused by him is one which could have been anticipated because there was a reasonable likelihood that it could happen.

> "Thus fault, as the term is usually understood, is not associated with conduct which causes harm through the concatenation of highly unusual circumstances. If, in our appraisal of the community's conception of fault, we find that the conduct in question clearly falls outside the conception, we are charged with the duty of withdrawing the issue from the jury."

*Stewart v. Jefferson Plywood Co.*, 255 Or 603, 609, 469 P2d 783 (1970) (footnote omitted). Because foreseeability is a matter of a community's judgment, whether a particular outcome of conduct is foreseeable should be decided by the community's proxy, that is, by a jury. Exceptions exist only for harm resulting from "the concatenation of highly unusual circumstances." *Id.*

■     *Fazzolari* reiterated that standard: "[T]he issue ordinarily can be left to the jury," except for conduct "at the outer margins." 303 Or at 12. In a companion case, the court phrased the standard this way: Foreseeability, as an "empirical question[ ]," must be submitted to a jury, except "in an extreme case a court can decide that no reasonable factfinder could find the risk foreseeable." *Donaca v. Curry Co.*, 303 Or 30, 38, 734 P2d 1339 (1987). More recently, we have stated, "The 'extreme case' contemplated by *Donaca* is the case that falls beyond the outer margins of debatable conduct. The cases that fall beyond the outer margins are few and far between and should be identified *ad hoc*." *Najjar v. Safeway, Inc.*, 203 Or App 486, 492, 125 P3d 807 (2005).

To gauge the reasonable foreseeability of the harm that occurred to plaintiffs, we must consider whether "the person harmed is one of the general class threatened" by defendants' conduct and whether the harm resulting from the conduct is "of the general kind to be anticipated from the conduct." *Stewart*, 255 Or at 609. Defendants are alleged to have failed in their duty to protect tenants from the criminal acts of third parties, and plaintiffs are tenants. Clearly, plaintiffs are what we have referred to as "foreseeable plaintiff[s]." *Najjar*, 203 Or App at 491 (internal quotation marks and citations omitted).

Whether the harm that befell them was also arguably foreseeable is not so clear. That is so because the cases

from the Oregon appellate courts are not altogether consistent with respect to the degree of similarity that must exist, in order for harm to a plaintiff to be considered "foreseeable," between that harm and earlier occurring harms or events of which the defendant is (or should be) aware. Some cases suggest that a very high degree of similarity is necessary. In *McAlpine*, 131 Or App at 143-44, we held that the plaintiff's injury at the hands of a negligently supervised parolee was not foreseeable as a matter of law, despite defendant's knowledge that the parolee had a long history of violent crime (armed robbery, bank robbery, assault), because the particular crime for which the parolee was being supervised at the time of his attack on the plaintiff, delivery of a controlled substance, was not itself violent. Likewise, in *Tenant Screening Services, Inc.*, 140 Or App at 52, we held that a plaintiff's injury by sexual assault at the hands of a third-party tortfeasor who had been screened and approved by the defendant was not foreseeable as a matter of law because the plaintiff

> "did not plead facts showing that [the assailant] had been convicted of any sexual offenses. The fact that he had been convicted of petty theft and 'fight/noise/offensive words' could suggest aggressive conduct but does not suggest an inclination to commit the serious sexual crimes of sodomy and sexual abuse."

These cases seem to hold that the criminal act of a third-party tortfeasor is, as a matter of law, not foreseeable unless the defendant knows or should know of prior crimes by the tortfeasor that are highly similar to the crime at issue.

However, in *Washa*, 159 Or App at 224-25, we appeared to retreat from the earlier cases. In *Washa*, the plaintiffs were a rape victim and the personal representative of the estate of a rape and murder victim. The defendant was alleged negligently to have supervised the parolee rapist/murderer, who had a history of assaulting women, including a conviction for assault with a knife. In holding that the criminal acts were not unforeseeable as a matter of law, we characterized *McAlpine* and *Tenant Screening Services* as follows:

> "Thus, in both *McAlpine* and *Tenant Screening Services*, in concluding that there was no liability under general foreseeability principles, we emphasized the third party tortfeasor's criminal history. Because the third party's ultimate

tortious conduct was qualitatively different from his prior acts, the harm resulting from that conduct was not reasonably foreseeable to the defendant. Where, however, the defendant can reasonably foresee likelihood of specific criminal conduct by a third party in light of the third party's criminal history and the defendant's knowledge of that history, the realization of that foreseeable likelihood cannot be deemed 'intervening' or 'supervening' causation that somehow precludes liability. We therefore conclude that our general foreseeability analysis in a negligent supervision claim properly turns on whether—in light of the third party's criminal history—the defendant could reasonably foresee that the third party, if inadequately supervised, would engage in the kind of criminal conduct that ultimately harmed the plaintiff."

*Id.* (footnote omitted). *Washa*, then, appears to replace what might be called a "nearly identical" requirement with what might be called a "qualitatively similar" requirement.

In doing so, we moved closer to a different line of cases—cases that would permit the jury to find foreseeability when there is less similarity between prior known events and the alleged tort. As early as *Danner v. Arnsberg*, 227 Or 420, 362 P2d 758 (1961), the Supreme Court held that if a plaintiff's injury was "of the same *general character*" as an injury that could be anticipated, the plaintiff's injury was not necessarily unforeseeable. *Id.* at 422 (emphasis added). In *Stewart*, the Supreme Court noted that " 'liability is confined to harms * * * that are of the *general kind* to be anticipated from the [allegedly tortious] conduct.' " 255 Or at 608-09 (quoting 1 Harper & James, *The Law of Torts* Introductory xl (1956) (emphasis and brackets added)). *Fazzolari* adopted the same standard; citing *Stewart*, the court explained:

"A defendant can be expected to argue that no one could have foreseen exactly what happened to the plaintiff, in this case, that [plaintiff] would be attacked on the schoolhouse steps and raped at 6:50 a.m. on May 21, 1982. A plaintiff's definition of what a responsible defendant should foresee can be expected to encompass all the animate and inanimate sources of injury in a dangerous world. But foresight does not demand the precise mechanical imagination of a Rube Goldberg nor a paranoid view of the universe. As already noted, *Stewart v. Jefferson Plywood Co.* made clear

> that the concept of foreseeability refers to *generalized risks of the type of incidents and injuries that occurred rather than predictability of the actual sequence of events*. In that case, for instance, a factfinder could conclude that the foreseeable risks included physical injury from falling through a roof in protecting a nearby building from fire rather than from being burned by the fire."

*Fazzolari*, 303 Or at 21 (emphasis added). This court has held that a jury might rationally conclude that a bank with a night depository should foresee criminal acts on its premises and that a "[p]laintiff is not required to plead specifically that defendant knew, or should have known, that customers using the depository in this particular bank had been robbed or assaulted in the past or that potential criminals were lurking around its night depository." *Torres*, 65 Or App at 215. More recently, this court held that a reasonable juror could find that a third-party tortfeasor's infliction of physical injury on the plaintiff was foreseeable based on earlier incidents involving threats and robbery but no physical harm. *Sande*, 185 Or App at 274.

From these cases, we can draw only one conclusion: whether a rational juror can find that harm is foreseeable, particularly in the context of criminal activity by third parties, is an *ad hoc* determination depending on the particular circumstances of each case. No bright line rules exist. Fact-matching is of limited utility. Unforeseeability as a matter of law should be found only in extreme cases.

Guided only by these vague and impressionistic precepts, we conclude that a rational juror could have found that the harm suffered by plaintiffs was the foreseeable consequence of defendants' acts and omissions. Such a juror could have found that defendants knew or should have known the following facts: the complex was in a high crime area; gunshots, car break-ins, and thefts had occurred in the area; a tenant in the complex had been threatened by a person wielding an ax; defendants' employees and tenants had frequently reported suspicious or illegal activities, including vandalism and trespass in the laundry facility where plaintiffs were attacked; it was understood among landlords that laundry facilities should have windows or peepholes and that the laundry shed in this case had neither; the complex was dimly

lit; the fence surrounding the complex was downed; the complex had attracted trespassers and transients in the past; and defendants' managers observed suspicious activity on the night of the attack and did not investigate. In short, a rational juror could find that defendants knew or should have known that their complex in general was attractive to criminals, that criminals frequented the area, and that the laundry shed in particular was ill-equipped to provide tenants with protection from them. The fact that no incidents of violence had occurred in the laundry room might be a persuasive point for defendants to make to a jury, but it is not, by itself, a point so persuasive that it prevents plaintiffs from getting to a jury in the first place.

Further, the actual harm that befell plaintiffs did not result from some strange "concatenation of highly unusual circumstances," *Stewart*, 255 Or at 609, nor from an extended sequence of improbable chance occurrences. That fact is important because, in some sense, foreseeability and causation are both functions of probability. Probability, and therefore foreseeability, decreases geometrically as steps between a defendant's action and a plaintiff's harm increase arithmetically. Thus, the harm that befell the plaintiff in *Buchler* was several steps removed from the conduct of the defendant: the defendant negligently left keys in a vehicle; a convict stole the vehicle; the convict then stole a gun from his mother; the convict then shot the plaintiff with that gun. 316 Or at 502. Although the foreseeability of a convict escaping in an unattended vehicle with keys in it is relatively high, and the foreseeability of an escaped convict stealing a gun is relatively high, and the foreseeability of an armed escaped convict shooting a person is relatively high, the foreseeability of all three of those occurrences happening in sequence is "at the outer margins." *Fazzolari*, 303 Or at 12. In the present case, by contrast, a criminal observed a vulnerable target and foreseeably took advantage of it.

Additionally, the relationship between defendants' conduct and plaintiffs' harm in this case is qualitatively different from that relationship in *Oregon Steel Mills*, a relationship that the Supreme Court deemed to be unforeseeable. 336 Or at 345. In that case, there was no causal relationship between the defendant's conduct (negligently preparing an

accounting report) and the "force" that inflicted harm on the plaintiffs (a declining stock market); the stock market did not take notice of the defendant's negligence and use the opportunity to decline. *Id.* The two events occurred in a temporal relationship to each other that was completely coincidental. In the present case, on the other hand, the relationship that was absent in *Oregon Steel Mills* is present: Bates *did* take notice of circumstances resulting from defendants' negligence, and it played a role in his decision to inflict harm—or at least a jury so could find.

In sum, we conclude that a reasonable juror could find that defendants breached their duty reasonably to avoid foreseeable harm to plaintiffs. The trial court erred in granting defendants' motions for summary judgment.

Reversed and remanded.