Argued and submitted September 26, 2007, affirmed November 12, 2008

Donald MILLER,
by and through his legal guardian,
Janis Miller,
*Plaintiff-Appellant,*

*v.*

TABOR WEST INVESTMENT CO., LLC,
an Oregon limited liability company,
and E. C. Owen Property Management, Inc.,
*Defendants-Respondents,*

*and*

B & D MANAGEMENT, INC.,
an Oregon corporation,
*Defendant.*

Multnomah County Circuit Court
041212888; A130947

196 P3d 1049

Wayne Mackeson argued the cause for appellant. With him on the briefs were Richard H. Braun, and Birmingham & Mackeson, LLP.

Robert L. Winkler argued the cause for respondent. With him on the brief was Parks, Bauer, Sime, Winkler & Fernety.

Before Haselton, Presiding Judge, and Brewer, Chief Judge, and Armstrong, Judge.

ARMSTRONG, J.

## ARMSTRONG, J.

In March 2003, plaintiff was assaulted and seriously injured by a man named Homer Woods in a convenience store located adjacent to the apartment complex where plaintiff and Woods both lived. Plaintiff[1] subsequently brought this action against the owners of the apartment complex and their property managers, Tabor West Investment Co., LLC, and E. C. Owen Property Management, Inc., respectively,[2] alleging claims for negligence and for damages under ORS 124.100. The trial court granted defendants' motion for summary judgment as to both claims, and plaintiff appeals. As explained below, we affirm.

We consider the facts in the summary judgment record in the light most favorable to plaintiff, the nonmoving party. ORCP 47 C; *McCabe v. State of Oregon*, 314 Or 605, 608, 841 P2d 635 (1992). Woods moved into the Barrington Square Apartments in January 2003. He had recently been released from the Oregon State Hospital following a 10-year commitment based on a judgment of "guilty except for insanity" of attempted first-degree assault and menacing. Owen, defendants' on-site apartment manager,[3] rented the apartment to Woods. Owen knew that Woods had spent "five to six or seven years" in the Oregon State Hospital for committing an assault; he also knew that Woods was on medication to "keep him mellow." He understood that the assault had something to do with Woods's military training. Owen did not obtain a credit or criminal history check on Woods before signing the rental agreement. Plaintiff, who is mentally ill, was also a tenant at Barrington Square Apartments and had been since 1997. Owen was aware of plaintiff's mental impairment and knew that he relied on his sister for care and

---

[1] The action was brought by and through plaintiff's legal guardian, Janis Miller.

[2] Plaintiff also named B & D Management, Inc., a fiduciary for Homer Woods, as a defendant. That defendant is not a party to this appeal. The remaining defendants, Tabor West Investment Co., LLC, and E. C. Owen Property Management, Inc., do not argue any basis for distinguishing between them in resolving this appeal; thus, we refer to them collectively as defendants.

[3] Defendants do not dispute that Owen was at all relevant times acting within the course and scope of his employment or agency relationship with defendants and, thus, his actions are properly attributable to defendants.

guidance. Owen also knew that plaintiff and Woods regularly talked and observed that plaintiff visited Woods's apartment two or three times a day.

One day, a month or so after he had moved in, Owen asked Woods to turn down the volume on his music. At the time, Woods was standing outside the open door of his apartment. Woods told Owen that if he did not like it, he could call the police. He then went back into his apartment, slammed the door, and turned the music up even louder. He also began to throw items out of his apartment onto the lawn. On the same day, Owen gave Woods a written 60-day "Notice of Termination with Cause"[4] for violating the terms of his rental agreement—specifically, not keeping noise to a reasonable level. The notice instructed Woods that he would be required to vacate the apartment by April 29 if he did not remedy the problem by April 13. During that evening and into the early morning hours of the next day, Owen saw that Woods "seemed to be on edge, talking to himself in his apartment with his windows open."

Approximately one week later, on March 7, 2003, Owen saw plaintiff and Woods arguing and saw Woods push plaintiff. He did not report the incident to the police nor did he contact plaintiff's sister. Plaintiff's sister stated in an affidavit that she believed that plaintiff would have avoided contact with Woods if someone had told him to do so.

The next day, March 8, Owen saw plaintiff knock on Woods's apartment door. When Woods did not answer, plaintiff stood in front of Woods's window for a few minutes modeling his new coat, then went out the walkway over to the adjacent 7-Eleven store. Woods followed plaintiff and physically assaulted him in the 7-Eleven, resulting in serious injuries to plaintiff.[5]

Plaintiff filed this action, alleging two claims for relief. In the first, plaintiff alleged that defendants were

---

[4] That 60-day notice is part of the summary judgment record; however, the record also includes a letter Owen wrote to Woods's fiduciary stating that he had given Woods a 30-day notice to terminate. That inconsistency in the record is ultimately immaterial to our analysis.

[5] Woods was subsequently arrested and returned to state custody.

negligent in one or more of the following particulars: (1) failing to keep the premises safe for its tenants; (2) failing to properly investigate Woods's background; (3) failing to warn other tenants concerning Woods despite knowing his history and propensity for violence; (4) failing to evict Woods from the apartment after his violent behavior at the premises; (5) failing to warn other tenants after Woods displayed violent behavior at the premises; (6) renting to Woods despite knowing of his mental illness and violent history; and (7) failing to warn or take other precautions to protect vulnerable tenants from Woods. Plaintiff's second claim for relief was a claim for damages under ORS 124.100 (2003), which authorized civil actions for the physical or financial abuse of an elderly or incapacitated person.

Defendants moved for summary judgment on both claims, the trial court granted defendants' motion, and plaintiff now appeals. For ease of reference, we discuss each claim—including the trial court's treatment of the claim—separately, beginning with plaintiff's negligence claim.

With respect to that claim, defendants argued below that their liability in negligence was to be determined solely by reference to the landlord-tenant relationship that existed between defendants and plaintiff—rather than by general foreseeability principles—and that, under that relationship, "an off-premises assault by a tenant is not the landlord's responsibility." Essentially, defendants argued that they cannot be held liable for plaintiff's injuries as a matter of law, because they had no duty as a landlord to investigate or evict Woods, nor to warn other tenants of his background or antisocial behavior. Alternatively, defendants contended that they could not be liable even under a general foreseeability theory because "mere facilitation of an unintended adverse result where the intervening intentional criminality of another person is the harm-producing event does not cause the harm so as to support liability for it."

The trial court concluded that the landlord-tenant relationship between defendants and plaintiff was irrelevant because the harm did not occur on the landlord's premises. Instead, citing *Park v. Hoffard*, 315 Or 624, 847 P2d 852 (1993), the court reasoned that defendants' duty to plaintiff

was of that owed by a landlord to any third party injured by a tenant of the landlord. Under the *Park* analysis, the court determined that defendants, as a matter of law, were not liable for the harms to plaintiff because "[d]efendants did not know that [Woods] constituted a danger to anyone at any time when they could terminate Woods's lease unilaterally (that is, at a time when they could exercise some control over Woods)." The court further concluded that, even under a general foreseeability analysis, defendants were not negligent as a matter of law because the intervening criminal conduct of Woods was the harm-producing force; at most, defendants merely facilitated Woods's attack on plaintiff by allowing him to live on their property.

We affirm the trial court's grant of summary judgment only if the record, viewed in the light most favorable to plaintiff, presents no disputed issues of material facts, and the undisputed facts entitled defendants to prevail as a matter of law. ORCP 47 C; *Jones v. General Motors Corp.*, 325 Or 404, 408, 939 P2d 608 (1997).

Our starting point is the Supreme Court's decision in *Fazzolari v. Portland School Dist. No. 1J*, 303 Or 1, 734 P2d 1326 (1987). The court there held that

"unless the parties invoke a status, a relationship, or a particular standard of conduct that creates, defines, or limits the defendant's duty, the issue of liability for harm actually resulting from defendant's conduct properly depends on whether that conduct unreasonably created a foreseeable risk to a protected interest of the kind of harm that befell the plaintiff. The role of the court is what it ordinarily is in cases involving the evaluation of particular situations under broad and imprecise standards: to determine whether upon the facts alleged or the evidence presented no reasonable factfinder could decide one or more elements of liability for one or the other party."

*Id.* at 17. As the parties correctly recognize, a landlord-tenant relationship is a type of special relationship that, under *Fazzolari*, bears on the determination of defendants' obligations to plaintiff. *McPherson v. Oregon Dept. of Corrections*, 210 Or App 602, 609-10, 152 P3d 918 (2007). They differ, however, in their assessment of the effect of that special relationship in the negligence analysis. In plaintiff's view,

because the *scope* of defendants' duty to plaintiff is not pre-scribed by either the landlord-tenant relationship or defen-dants' status as "landlord and possessor of land," that scope is properly determined by reference to common-law principles of reasonable care and foreseeability of harm—that is, whether defendants' alleged conduct unreasonably created a foreseeable risk of the harm suffered by plaintiff. Under that test, plaintiff argues, a reasonable juror could find that defendants' obligations to plaintiff encompassed a duty (1) to warn plaintiff about Woods's background and dangerous pro-pensity and (2) to take reasonable steps to protect plaintiff from Woods, and that defendants breached that duty by fail-ing to do so.

In contrast, defendants assert that the landlord-tenant relationship both defines and *limits* defendants' duty to plaintiff and, hence, the general foreseeability principles of *Fazzolari* are simply not applicable. They rely on *Dikeman v. Carla Properties, Ltd.*, 127 Or App 53, 60, 871 P2d 474 (1994), in which we stated:

> "[T]he existence of a special relationship—as, for example, the one between a landlord and a tenant—'creates, defines, or limits' the duties that are owed by the parties to that relationship. *Fazzolari*[, 303 Or at 17]; *see also Buchler v. Oregon Corrections Div.*, [316 Or 499, 504-05, 853 P2d 798 (1993)] (citing *Park*[, 315 Or at 631-32]). As the court explained in *Buchler*, '[i]t is only when there is *no* such spe-cial relationship * * * that *Fazzolari's* general foreseeabil-ity principle * * * comes into * * * play.' 316 Or at 504."

(Footnote omitted; emphasis, ellipses, and final bracketing in *Dikeman*.)

■       The Supreme Court, however, has since rejected such a strict categorical approach—that is, dividing torts into claims in which the plaintiff invokes a special relationship and "liability depends solely on the scope of the duty associ-ated with that relationship," and those in which the plaintiff invokes no special relationship and the "general negligence standard of reasonable foreseeability applies." *Oregon Steel Mills, Inc. v. Coopers & Lybrand, LLP*, 336 Or 329, 341, 83 P3d 322 (2004). Rather, as was the case in *Oregon Steel Mills*,

the special relationship between the defendant and the plaintiff may establish the *existence* of a duty of care on the part of defendant, but "the *scope* of that particular duty in that particular relationship turns out to be limited to harms to plaintiff that were reasonably foreseeable." *Id.* (emphasis in original). The court explained:

> "Even when a special relationship is the basis for the duty of care owed by one person to another, this court has held that, if the special relationship (or status or standard of conduct) does not prescribe a particular scope of duty, then '[c]ommon law principles of reasonable care and foreseeability of harm are relevant.' *Cain v. Rijken*, 300 Or 706, 717, 717 P2d 140 (1986) (quoted with approval in *Fazzolari*, 303 Or at 16-17)."

*Id.* at 342 (brackets in original). The court pointed to *Buchler* as amplification of that principle, noting that, there, the state defendant occupied a "status" (as the jailer of an escaped prisoner) that raised duties of care, but "those duties of care were based on common-law principles and did not provide a separate basis for liability in that case, in part because the harm to plaintiff was not foreseeable[.]" *Oregon Steel Mills*, 336 Or at 342. Thus, the court concluded, "when a plaintiff alleges a special relationship as the basis for the defendant's duty, the scope of that duty may be defined or limited by common-law principles such as foreseeability." *Id.*

As noted, in this case, the parties agree that the landlord-tenant relationship is a special relationship that bears on defendants' obligations to plaintiff. Consequently, we must first determine whether the scope of the duty of care owed by defendants to plaintiff in this case is prescribed by that relationship. Defendants contend that it is, relying on *Park*. We disagree.

In *Park*, the precise issue was whether the landlord could be liable for injuries suffered by the plaintiff as a result of an attack by a tenant's dog that occurred off the rental property, where the plaintiff claimed that the attack resulted from the landlord's failure to evict the tenant or take measures to control the dog. 315 Or at 627. In those circumstances,

the court held that the defendant's duty was properly prescribed by the *Restatement (Second) of Torts* § 379A (1965), concluding:

> "That is, a landlord can be liable for such harm only if (1) the landlord, at the time of entering into a lease, at the time of renewing a lease or a periodic tenancy, or at any time during a tenancy at will or other tenancy that the landlord is able to terminate unilaterally, consents to such activity or knows that it will be carried on, and (2) the landlord knows or has reason to know that the activity will unavoidably involve an unreasonable risk of harm to persons off the rental property."

315 Or at 632.

Defendants fail to recognize, however, that, while the court held that that was "an appropriate rule" to apply in determining a landlord's liability for physical harm to persons off the rental property caused by the tenant's dog, *id.* at 632, it did not attempt to prescribe the universe of the defendant's duty of care as a landlord. Significantly, the scope of the defendant's liability in *Park* was premised on the landlord-tenant relationship between the defendant and the tenant whose conduct was the harm-producing force. Here, a landlord-tenant relationship also exists between defendant and *plaintiff*, a circumstance that *Park* simply does not address. Thus, contrary to defendants' assertions, plaintiff's reliance on general foreseeability principles to determine the parameters of defendants' duty of care to plaintiff is not precluded by *Park*.

Plaintiff, on the other hand, invokes *Fuhrer v. Gearhart By The Sea, Inc.*, 306 Or 434, 760 P2d 874 (1988), as support for the theory that the scope of the duty owed by defendants to plaintiff, as plaintiff's landlord and as a possessor of land, is to be determined by resort to common-law principles of foreseeability. In *Fuhrer*, the plaintiff's decedent, a guest at the defendant's hotel, died while attempting to rescue some children, also guests of the hotel, who were apparently caught in an undertow or some other hazardous condition of the surf on the beach next to the hotel. The plaintiff

alleged that the decedent's death was the result of the defendant's failure to warn its guests about the dangerous condition of the surf or to provide safety measures.

The court first determined the appropriate analytical approach to be followed when the negligence alleged is a failure to warn or protect:

> "Failure to warn or protect should be analyzed in terms of foreseeability and unreasonable conduct. If a specific affirmative duty is imposed by statute, status or relationship, an analysis based on that specific duty is *also* appropriate. As noted in *Fazzolari*, the difference between a traditional duty analysis and a foreseeability analysis may be only semantic. In 'duty' terms, a defendant may be found to have a duty to warn another of an undue risk of harm to a protected interest of the other if the defendant knows of the risk. *See* the discussion of Prosser and Keeton, *The Law of Torts* (5th ed 1984), and Harper, James & Gray, *The Law of Torts* (2d ed 1986), in *Fazzolari*, 303 Or at 9. If the defendant has a specific duty to the plaintiff, the defendant may also be liable without knowledge of the risk; that depends on the terms of the particular duty. Absent an affirmative duty, the existence of a 'duty' in the given circumstances is a conclusion to be reached, not a means of analysis."

*Fuhrer*, 306 Or at 438 (emphasis added). The court then considered the role of the defendant's status as innkeeper in the negligence analysis, noting that, under the *Restatement (Second) of Torts* § 314A, an innkeeper's duties to its guests traditionally encompassed an affirmative duty to warn only of nonobvious dangerous conditions *on* the premises. *Id.* at 440-41. The court observed that support for the traditional rule was no longer universal; however, it also declined to follow the lead of some jurisdictions that had extended the duty to warn of all possible dangers off the premises as a matter of law. *Id.* Instead it held that

> "[i]nnkeepers and possessors of land have an affirmative duty to warn their paying guests and invitees of foreseeable unreasonable risks of physical harm; when the risk involves a dangerous condition off the premises, the trier of fact must decide the reasonableness of the failure to warn in all the circumstances."

*Id.* at 441.

Defendants argue that, unlike *Fuhrer*, this is not a "failure-to-warn" case. They contend that they had no duty as a landlord to warn plaintiff about Woods or to protect plaintiff from him, and that, unlike the ocean and beach at issue in *Fuhrer*, Woods is not a "condition" of defendants' land, or of any land. We are not persuaded by defendants' attempt to distinguish *Fuhrer*. As the court in *Fuhrer* explained, "the risk of harm created [in a warning case] is exposure to a danger known to the defendant." *Id*. at 438. Here, the allegedly dangerous condition known to defendants is Woods's presence as a tenant in the apartment complex; the risk of harm is exposing other tenants to that presence.

██ We agree with plaintiff that resolution of the specific issue of whether a landlord's duty encompasses a duty to warn or otherwise protect tenants against that risk of harm is, as in *Fuhrer,* a matter of general foreseeability in the specific circumstances of each case. In short, we conclude that the landlord-tenant relationship imposes on a landlord an affirmative duty to take reasonable steps to warn or otherwise protect a tenant from "foreseeable unreasonable risks of physical harm" posed by another tenant, whether on or off the premises. *Cf. McPherson*, 210 Or App at 612 (the scope of a landlord's duty to its tenants includes a "duty to take reasonable steps to protect tenants in the property's common areas from reasonably foreseeable criminal acts by third persons").[6]

██ The issue therefore reduces to whether, on the facts viewed in the light most favorable to plaintiff, no reasonable juror could conclude that defendants' failure to warn plaintiff about Woods's history or behavior or to take measures to protect him from Woods created a foreseeable risk that plaintiff

---

[6] In *McPherson*, we relied, in part, on comment *l* of Section 17.3 of *Restatement (Second) of Property*, Landlord & Tenant (1977), which provided:

" 'For the purpose of this section, the unreasonable risk of harm from criminal intrusion constitutes a dangerous condition, so that where the landlord could by the exercise of reasonable care have discovered the unreasonable risk of criminal intrusion and could have made the condition safe from such unreasonable risk of criminal intrusion, he is subject to liability for physical harm caused by criminal intrusion if he has not taken the necessary precautions.' "

*Id*. at 611.

would be assaulted by Woods. Although foreseeability is generally a fact question for the jury and thus not a likely candidate for summary judgment, that rule is not absolute. *Fazzolari*, 303 Or at 17-18; *Cunningham v. Happy Palace, Inc.*, 157 Or App 334, 337, 970 P2d 669 (1998), *rev den*, 328 Or 365 (1999). Rather, " '[t]he court intervenes only when it can say that the actor's conduct clearly meets the standard [of reasonable conduct deemed to have been set by the community] or clearly falls below it.' " *Fazzolari*, 303 Or at 18 (quoting *Stewart v. Jefferson Plywood Co.*, 255 Or 603, 607, 469 P2d 783 (1970)). In short, in an "extreme case," a court can decide that the risk to the plaintiff caused by the defendant's conduct was unforeseeable as a matter of law. *Donaca v. Curry Co.*, 303 Or 30, 38, 734 P2d 1339 (1987). In our view, this is such a case.

■■ The fact that the injury was inflicted by a third person—here Woods—does not necessarily render the harm unforeseeable to the defendant as a matter of law. *Fazzolari*, 303 Or at 20. However, the Supreme Court has held that such a harm may be legally unforeseeable if the defendant's conduct constituted "mere facilitation" of the third person's intervening intentional criminal acts. *Buchler*, 316 Or at 511-12. In *Buchler*, a state prisoner escaped from a work crew using a van in which the supervisor had left the keys and, two days later and 50 miles away, shot two people and killed one of them. The Supreme Court held, as a matter of general negligence, that the harm that actually occurred did not result from any risk of harm that was unreasonably created by leaving the keys in the van and that summary judgment was therefore appropriate. As the court explained:

"While it is generally foreseeable that criminals may commit crimes and that prisoners may escape and engage in criminal activity while at large, that level of foreseeability does not make the criminal's acts the legal responsibility of everyone who may have contributed in some way to the criminal opportunity. * * * Thus, in a general sense, it is foreseeable that anyone whose conduct may in any way facilitate the criminal in committing the crime has played some part in the resulting harm. But mere 'facilitation' of an unintended adverse result, where intervening intentional criminality of another person is the harm-producing

force, does not cause the harm so as to support liability for it."

*Id.* at 511-12. Applying that reasoning, the court further determined that liability based on the defendant's failure to warn the plaintiffs that an escaped criminal might be in the area was not tenable because the plaintiff failed to produce evidence that the defendant knew or had reason to know of *the specific danger* presented by the prisoner to the plaintiffs. In the absence of that knowledge, "it was not reasonably foreseeable that the escapee posed a risk of harm to persons in plaintiffs' position." *Id.* at 516.

Our cases following *Buchler* have recognized that the third-party criminal offender's criminal history and propensity for violence—at least insofar as it was or should have been known to the defendant—is an important consideration in determining whether the harm by the offender was reasonably foreseeable. *See, e.g., Panpat v. Owens-Brockway Glass Container*, 188 Or App 384, 394-95, 71 P3d 553 (2003) (where the defendant knew that the tortfeasor had significant mental health problems related to the breakup of a romantic relationship with the decedent, that he was on psychiatric medical leave until he received further mental health evaluation, and that there had been previous verbal confrontations between the tortfeasor and the decedent, the jury could have found that the harm was reasonably foreseeable); *Washa v. DOC*, 159 Or App 207, 225, 979 P2d 273 (1999), *aff'd by an equally divided court*, 335 Or 403, 69 P3d 1232 (2003) ("[O]ur general foreseeability analysis in a negligent supervision claim properly turns on whether—in light of the third party's criminal history—the defendant could reasonably foresee that the third party, if inadequately supervised, would engage in the kind of criminal conduct that ultimately harmed the plaintiff."); *Allstate Ins. Co. v. Tenant Screening Services, Inc.*, 140 Or App 41, 51-52, 914 P2d 16 (1996) (plaintiff's sexual assault by a third-party tenant whom the defendant had negligently screened as having a "clear record" was not foreseeable as a matter of law in part because the plaintiff did not plead facts showing that the assailant had been convicted of any offenses suggesting "an inclination to commit the serious sexual crimes of sodomy and sexual abuse"); *McAlpine v. Multnomah County*, 131 Or

App 136, 143-44, 883 P2d 869 (1994), *rev den*, 329 Or 507 (1995) (injuries sustained by the plaintiff at the hands of a negligently supervised parolee were not risks unreasonably created by the defendant's failure to arrest him because, although the defendant knew that the parolee had a history of violent crimes, neither the warrant nor the drug offense for which he was on parole suggested that he was prone to violence against members of the general public). We have also considered the vulnerability of the plaintiff as a relevant factor in the foreseeability analysis. *See Cunningham*, 157 Or App at 339-40 (in light of evidence that intoxicated people are more likely to be injured or victims of crime, a defendant's conduct in making an intoxicated patron leave a bar without letting her make a telephone call could constitute more than "mere facilitation" of the sexual assault the plaintiff subsequently suffered while attempting to hitchhike from the bar).

However, as we recently emphasized in *McPherson*, 210 Or App at 617, "whether a rational juror can find that harm is foreseeable, particularly in the context of criminal activity by third parties, is an *ad hoc* determination depending on the particular circumstances of each case." In this case, those circumstances lead us to conclude that the harm suffered by plaintiff was not, as a matter of law, a reasonably foreseeable consequence of defendants' acts and omissions.

Plaintiff argues that, based on what defendants knew of Woods's "criminal history, psychiatric problems, and conduct" at the apartment complex, as well as what they knew about plaintiff's vulnerability, Woods's assault on plaintiff *was* a reasonably foreseeable consequence of defendants' failure to warn plaintiff or to take other steps to protect him. We are unpersuaded.[7]

First, with regard to Woods's "criminal history" and "psychiatric problems," the record supports that defendants knew the following: (1) Woods was a former Marine who had just been released from the Oregon State Hospital; (2) he had been there for "five to six or seven years" as the result of an assault; and (3) he was on medication to "keep him mellow."

---

[7] Although plaintiff initially advanced an argument that focused on information that defendants should have known about Woods, we conclude that plaintiff abandoned that argument.

From those facts, the record is also susceptible of an inference that defendants knew that Woods had a mental illness; it does not, however, support a finding that defendants knew that Woods had been adjudged "guilty except for insanity" or that he had previously been determined to be a danger to the community, as plaintiff suggests. In fact, there is nothing in the record to indicate that defendants were aware of *any* of the details or characteristics of Woods's mental illness, other than that he was taking medication. Most significantly, there is nothing in the record to indicate that defendants knew that Woods was prone to violence as a result of his mental illness. Further, the record does not permit an inference that defendants were aware of the circumstances of Woods's release— that is, that he was being released because he had served the full term, not because his mental condition had been successfully treated.

Likewise, plaintiff did not produce evidence indicating that defendants knew the circumstances surrounding Woods's assault or even the specific nature of the crime (attempted assault in the first degree). For example, had the evidence shown that Woods's criminal history involved a random, unprovoked attack against a neighbor or stranger—and that defendants knew of those circumstances—a rational person might conclude that the risk of Woods assaulting plaintiff was reasonably foreseeable. Instead, on this record, all defendants knew about Woods's assault was that it occurred at least five years before, that it may have been related to Woods's military training, and that he ended up at the Oregon State Hospital as a result. From that information, no reasonable person could conclude that it was reasonably foreseeable that Woods would become violent and cause bodily harm to another tenant.

The final question is whether that knowledge of Woods's criminal history and mental illness, when combined with defendants' knowledge of Woods's behavior after moving into the apartment, could nonetheless support a finding that Woods posed a foreseeable risk of harm of the type plaintiff suffered. Plaintiff points to two incidents in particular. The first occurred when Owen asked Woods to turn down the volume of his stereo. Woods's reaction was to tell Owen to call the police if he did not like it, slam the door, and turn the

music up louder. Later, he threw some things from his apartment out onto the lawn. Owen also observed that Woods was "on edge" and talking to himself that night and into the morning. While Woods's behavior was irrational, and may even have indicated that Woods's mental condition was deteriorating, it does not suggest—particularly in light of what defendants knew about Woods's mental illness—that defendants should have anticipated that that behavior would escalate into physical violence, particularly violence against another tenant.

The second incident occurred approximately one week later. On that day, Owen witnessed Woods physically "push" plaintiff. The only evidence in the record about that interaction, however, is Owen's own deposition testimony that, while he did not remember seeing Woods push plaintiff, his failure to recall the incident may have been because he thought it was "more of a friendly push than something serious." At best then, the evidence suggests a general aggressiveness on the part of Woods; it does not suggest an inclination to commit a violent assault against plaintiff.

In that sense, the present case is markedly distinct from our recent decision in *Fraker v. Benton County Sheriff's Office*, 214 Or App 473, 166 P3d 1137, *adh'd to on recons*, 217 Or App 159, 174 P3d 1111 (2007), which was decided after this case was briefed. In that case, Fraker, the husband and stepfather of the plaintiffs, held the plaintiffs hostage in their home for hours, brandished a gun repeatedly, and terrorized them with threats to kill them, before finally turning the gun on himself and killing himself. *Id.* at 478. There was evidence that the defendant, a friend of Fraker's, knew that Fraker had a history of violence and threats against the plaintiffs and knew that he had directly threatened to kill the plaintiffs and then kill himself on more than one occasion. In reversing the grant of summary judgment for the defendant, we concluded that "the particular kinds of acts and the particular victims were precisely those that one might have expected," and, thus, "the intervening harm-producing force, Fraker's criminal conduct, was a risk that was directly related to the defendant's failure to report Fraker's threats and her giving him access to a gun." *Id.* at 492.

In sum, even recognizing that the concept of foreseeability refers to "generalized risks of the type of incidents and injuries that occurred rather than predictability of the actual sequence of events," *Fazzolari*, 303 Or at 21, in the absence of more specific knowledge of the risk of the type of harm that befell plaintiff, we conclude that defendants' conduct constituted "mere facilitation" of Woods's intervening criminal conduct. Thus, as a matter of law, Woods's attack on plaintiff was not a "reasonably foreseeable" consequence of defendants' failure to warn or otherwise protect plaintiff. Defendants cannot therefore be liable for damages based on that failure. Accordingly, the trial court did not err in granting summary judgment for defendants on plaintiff's negligence claim.

We turn to plaintiff's claim for damages under ORS 124.100 (2003).[8] That statute provides, in part:

"(1) An elderly or incapacitated person who suffers injury, damage or death by reason of physical abuse or financial abuse may bring an action against any person who has caused the physical or financial abuse or who has permitted another person to engage in physical or financial abuse. * * *

"* * * * *

"(2) An action may be brought under the provisions of this section only by * * * an incapacitated person, by a guardian, conservator or attorney-in-fact for a person who is incapacitated * * *.

"(3) An action may only be brought under the provisions of this section for physical abuse described in ORS 124.105 * * *.[9]

---

[8] Although the 2001 version of the statute was in effect at the time of plaintiff's injury on March 8, 2003, the 2003 amendments (providing for treble damages) expressly apply with respect to causes of action filed on or after January 1, 2004. Or Laws 2003, ch 211, §§ 1, 2. The cause of action in this case was filed after that date; hence, we refer to the 2003 version of the statute in this opinion. The statute was further amended in 2005 and 2007. *See* Or Laws 2005, ch 87, § 1, Or Laws 2005, ch 386, § 1a; Or Laws 2007, ch 70, § 30. Those amendments do not apply with respect to this case.

[9] We quote the relevant portion of the 2001 version of ORS 124.105, which was in effect at the time of plaintiff's injury:

"(1) An action may be brought under ORS 124.100 for physical abuse if the defendant engaged in conduct against an elderly or incapacitated person that would constitute any of the following:

"(4) An action may be brought under this section against a person for permitting another person to engage in physical or financial abuse if the person knowingly acts or fails to act under circumstances in which a reasonable person should have known of the physical or financial abuse."

The trial court granted summary judgment in favor of defendants, reasoning that, by using the word "permit," the legislature intended to impose liability only where a defendant has some right to control the perpetrator. Because defendants had no authority or means to control Woods, and because they were not negligent under the circumstances in allowing plaintiff to live on their property, the court concluded that defendants could not be liable under the statute.

Plaintiff challenges those conclusions on appeal, arguing that negligence is not required and that, under the meaning of the term "permitting" as described in the statute itself, there is evidence from which a jury could reasonably find that defendants "permitt[ed]" the abuse of plaintiff by failing to take any action to prevent the abuse under circumstances in which a reasonable person should have known of the abuse.

Defendants remonstrate that, under the relevant dictionary definition of the term "permit," defendants cannot be liable because they did not "control, direct, consent to, or authorize the assault on plaintiff." They further argue that they did not "knowingly act[ ] or fail[ ] to act" as required under the statute because they neither witnessed the attack nor "engaged in [the] conduct" of assault as required by ORS 124.105.[10]

---

"(a) Assault, under the provisions of ORS 163.160, 163.165, 163.175 and 163.185."

ORS 124.105 has been subsequently amended by the legislature. Or Laws 2003, ch 577, § 4; Or Laws 2005, ch 386, § 2.

[10] We readily reject defendants' argument that ORS 124.105(1)(a) requires that defendants actually have committed the assault. By expressly authorizing an action under the statute for "permitting" another person to engage in physical abuse, ORS 124.100 patently refutes that suggestion. Defendants' reading would render that portion of ORS 124.100(1)—as well as all of subsection (4) defining what it means to "permit" abuse—superfluous. ORS 174.010 requires us to construe statutes, if possible, so as to give effect to all of their provisions. We therefore reject defendants' proposed construction of ORS 124.105(1)(a).

In construing a statute, our task is to ascertain the intention of the legislature in enacting the statute. In this case, that intent can be easily discerned by reference to the text of the statute itself. As noted, ORS 124.100 authorizes, as relevant here, an action by an incapacitated person (or his or her guardian) against any person "who has permitted another person to engage in physical or financial abuse." ORS 124.100(1), (2). In subsection (4), the legislature then specifically defined what it meant by that phrase, to wit: "An action may be brought under this section against a person for permitting another person to engage in physical or financial abuse *if the person knowingly acts or fails to act under circumstances in which a reasonable person should have known of the physical * * * abuse.*"[11] (Emphasis added.) Given that clear statutory definition, we see no reason to turn to the dictionary to ascertain the statute's meaning. *See State v. Murray*, 340 Or 599, 604, 136 P3d 10 (2006) (*"Absent a special definition*, we ordinarily would resort to dictionary definitions, assuming that the legislature meant to use a word of common usage in its ordinary sense." (Emphasis added.)).

■  The "physical abuse" alleged to have been permitted by defendants here is Woods's assault on plaintiff at the 7-Eleven store. Thus, defendants could be liable under the statute only if they "knowingly act[ed] or fail[ed] to act under circumstances in which a reasonable person should have known of" that assault. Plaintiff's claim is premised on the latter, that is, defendants' failure to act to prevent the assault. To survive summary judgment, therefore, plaintiff had to submit evidence from which a jury could conclude that defendants failed to act to prevent an assault that a reasonable person should, under the circumstances, have known that Woods would commit. The record does not support such a finding here.

On the day of the assault, Owen did not witness any physical altercation or interaction between Woods and plaintiff. Instead, Owen saw plaintiff knock on Woods's apartment

---

[11] "Physical abuse" is, in turn, defined to include, among other things, conduct that would constitute any of the various degrees of assault under Oregon law. ORS 124.105(1)(a) (2001).

door; when Woods did not answer, plaintiff stood in front of the window for a few minutes and then left.[12] Indeed, the only evidence of possibly negative interaction between the two men of which Owen was aware was a "push" the day before. However, the only indication of the nature of that event came from Owen, who testified that it likely was "a friendly push." Indeed, Owen testified that plaintiff and Woods often talked together and Woods visited plaintiff's apartment "two or three times a day." There is no evidence that Woods reacted negatively to any of those visits or from which to infer that Owen knew that Woods felt animosity toward plaintiff. In short, there is no evidence from which a jury could conclude that a reasonable person under those circumstances "should have known" that Woods would follow plaintiff off the premises and violently assault him. For those reasons, we conclude that summary judgment for defendants on plaintiff's claim under ORS 124.100 was appropriate.[13]

Affirmed.

---

[12] In his deposition testimony, Owen said that he saw plaintiff "making a nuisance of himself [by modeling the coat] and [Woods] is getting mad at him for it." However, he explained that his feeling was based on the fact that Woods did not open the door for plaintiff, not because he witnessed any indication of Woods's animosity or antagonism toward plaintiff. In fact, his comment was prefaced by this statement: "I just remember the humor of the circumstance to me, at that time, because I wasn't, didn't see anything serious happening."

[13] Although our reasoning differs from that on which the trial court relied, it is nonetheless based on a fully developed record below. *See Outdoor Media Dimensions Inc. v. State of Oregon*, 331 Or 634, 659-60, 20 P3d 180 (2001) (explaining "right for the wrong reason" principle).